**GUNG YOU v. NAGLE, Commissioner of Immigration.**

Circuit Court of Appeals, Ninth Circuit.
September 23, 1929.

No. 5809.

Stephen M. White, of San Fancisco, Cal,, for appellant.

George J. Hatfield, U. S. Atty., and George M. Naus, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge. This is an appeal taken from the order of the District Court for the Northern District of California denying a petition for a writ of habeas corpus. The appellant, a Chinese boy, was born in China of Chinese parents on February 22, 1915. On October 3, 1928, when 13 years of age, he arrived in the United States and applied to the immigration authorities at the Port of San Francisco for admission into the United States, alleging citizenship through his alleged father, one Gung Sam, who is conceded to be a native-born citizen of the United States. His case was tried by a Special Board of Inquiry, which found, on November 19, 1928, that he was not entitled to admission for the reason that he failed to reasonably establish that he is the son of Gung Sam. An appeal was taken to the Secretary of Labor, who affirmed the decision of the Board of Special Inquiry and ordered appellant deported. He is now being held in custody by appellee for deportation.

The testimony before the immigration authorities is in absolute agreement as to matters respecting appellant's family relations, the principal events of his family life, and as to description and conditions in the Haw Hong Village, Sun Ning District, the village in China where appellant was born and has lived all his life; that the alleged father has made various trips to China and has three sons already admitted to and residing in this country and that on every occasion (at least six) he has claimed to have a son, Gung You, born February 22, 1915; that Gung Sam was in China at such a time at to make possible his paternity to a child of the appellant's age, he having departed from the United States in June, 1913, and returned to this country in August, 1914; that the appellant's prior landed brothers, on the occasion of their applications for admission into the United States, claimed to have a brother Gung You, born February 22, 1915. The immigration authorities also concede that the appellant bears some facial and physical resemblance to his alleged father, Gung Sam, and appears to be about the age alleged.

The order of exclusion was based upon certain evidence indicating fraud and discrepancies on the part of the applicant and his father. A photograph was produced on behalf of the applicant showing himself and his alleged brother Gung Dock together. The Special Board of Inquiry concluded that this photograph was fabricated, in that photographs of the two alleged brothers taken separately had been combined in one photograph in such fashion as to convey the impression that they were together at the time the photograph was taken, and thus to fortify the claimed relationship. The fabrication of testimony is always a badge of weakness in a case, and when clearly established justifies a conclusion of fraud in the entire case. Allen v. United States, 164 U. S. 492, 499, 500, 17 S. Ct. 154, 41 L. Ed. 528; McHugh v. McHugh, 186 Pa. 197, 40 A. 410, 41 L. R. A. 805, 65 Am. St. Rep. 849; Nowack v. Metropolitan St. Ry., 166 N. Y. 433, 60 N. E. 32, 54 L. R. A. 592, 82 Am. St. Rep. 691; B. & O. R. Co. v. Rambo (C. C. A.) 59 F. 75. The applicant did not introduce this photograph in support of his claim to American citizenship, but it was produced by his alleged brother Gung Tun, when the latter was later examined. This witness simply said that he knew nothing of the picture, save that his mother gave it to him. He did not notice anything irregular about it, and could not see anything wrong with it. We have examined the picture and cannot say that it is so plainly fabricated as to attract the attention of any one but an expert, if it is fabricated. The applicant later, confronted with this picture, testified that he remembered when it was taken and that Gung Dock and he were together at the time, although he had apparently forgotten the incident when first questioned as to photographs. Now it is quite possible that the two boys went to a photographer for a group picture and that one negative was good of only one and the other good of the other only, and that the photographer combined the two by eliminating the bad and combining the good negative. Certainly, in the face of the positive and direct testimony to the fact of the relationship—the ultimate fact—and of testimony that the two boys went to the gallery together, the mere circumstance that they were not both on the negative reproduced by the photographer would hardly be evidence of an intent to fabricate evidence for production years later, particularly in view of the presumption of innocence which applies in civil as well as criminal matters.

There were other grounds stated by the Board for its conclusions which may now be briefly considered. The appellant readily identified a photograph of two prior landed uncles, although it appears that he had never seen his uncles as he said he did, and although he also says that there was no picture of them in his home. If he had failed to identify the photograph, it might be considered of some importance. His ability to do so hardly justifies a rejection of his testimony.

A family photograph taken in China in April, 1923, used as evidence on the admission of Gung Dock, an alleged brother of appellant, and on file with the immigration authorities, shows the alleged father, Gung Sam, and his wife, Chin Shee, and his son Gung Dock and his son Gung Tun and wife. In explaining the absence of the appellant from this family photograph, it was said to have been due to his illness. Certain discrepancies concerning the character of that illness, and the attendance of doctors upon the appellant at that time, were developed by the separate examination of the alleged father and his alleged son, the appellant. The explanation of the absence of Gung You from this family photograph was first made to the immigration authorities when the alleged father, Gung Sam, landed with his older son, Gung Dock, in 1927. The evidence taken at long intervals and covering the entire life of Gung You, in fact evidence taken concerning the marriage of the father, Gung Sam, concerning his departures to and return from China, clearly indicate that in the ordinary course of nature a son or daughter would be born about the time Gung You was born. The arrival of this son was duly chronicled in the records of the immigration service, by the sworn testimony of the alleged father, of his two brothers, uncles of the appellant, and of his two older sons. Thus the testimony of five witnesses given on different occasions, when the subject was purely incidental to the matter under investigation, confirms the ordinary course of nature. To reject this evidence under the circumstances would be equivalent to a refusal to hear them at all, and would be a flagrant disregard of the fundamental principles for the administration of justice.

We apprehend from the record that the immigration authorities had no doubt as to the existence of a son of Gung Sam, named Gung You, aged about 13 years. The question on which they were in doubt was whether or not Gung You was that son. As certified by the Special Board of Inquiry, he qualified as such son, by showing an intimate knowledge of the family and home and village of Gung Sam; he further qualified by age and

appearance, by his race and language; but he was absent from the family group in 1923, when he was sick, as all agree, and as the immigration authorities had been advised in 1927 by the father and two sons. Are discrepancies as to the seriousness of this illness to be regarded as material? The explanation was reasonable.

Another discrepancy relates to the time when an alleged brother of appellant, Gung Dock, quit school to come to the United States.

In the midst of a long examination, the appellant was asked:

"Q. When did Gung Dock quit school before coming to the United States? A. He quit school at the end of C. R. 15 (1926).

"Q. What did he do during all that part of C. R. 16 (1927) that he was in How Hong New Village? A. He had no occupation.

"Q. Why did he stay home from school for such a long time before coming to the United States? A. I don't know why."

Earlier he was asked:

"Q. When did Gung Dock quit school before coming to the United States? A. He didn't go to school last year."

Gung Dock arrived here November 14, 1927, at which time his father, Gung Sam, stated that he quit school in July, 1927, and that the appellant went to school with him during that period. Gung Dock confirmed that statement. As to this discrepancy the chairman of the Special Board of Inquiry said: "In my opinion, a more serious discrepancy could not occur in the testimony of the applicant, and no explanation can be offered for its occurrence, in my opinion, which would be a reasonable one." The attention of the applicant was not directed to the long period involved in his first answer. It is more than probable that he said C. R. 15 when he meant C. R. 16. Such slips frequently occur in testimony, and unless his attention was specifically directed to the point that under his answer his brother, Gung Dock, was out of school for a year and a half, the point can hardly be dignified as a discrepancy.

The question as to the relation of the court's determinations of the effect of discrepancies of testimony and the action of the immigration authorities on that subject is not very clearly defined, and the tendency seems to be to determine in each individual case whether or not there has been so flagrant a disregard of evidence, by the immigration authorities, as to constitute a denial of due process of law to which the applicant is entitled. It has been suggested, rather than de-cided, in one or two cases, that the test as to value of discrepancies lies in their materiality to the question under investigation, and that question in the case of applicants who claim American citizenship by reason of being sons or daughters of an American citizen is the question of paternity. Unless some such rule is adopted, the decisions of the courts on habeas corpus will be purely speculative, for "discrepancies" per se have no significance. The present statement of the rule is that the courts will only interfere in such plain cases of flagrant disregard of fundamental principles of justice as constitute a denial of due process of law.

The courts are powerless to interfere with conclusions of the immigration authorities and can only deal with cases where the principles of justice have been flagrantly outraged. The refusal to hear competent witnesses or competent testimony available is a denial of due process of law, as we held in a recent case refusing to permit the taking of a deposition in such cases. Young Bark Yau v. U. S. (C. C. A. No. 5777, filed June 17, 1929) 33 F.(2d) 236. The mere hearing of witnesses by an officer is of no avail to a party, if the evidence of competent witnesses is to be entirely disregarded and findings made in the teeth of the testimony of one or a dozen such witnesses, either because of a fixed policy to give a weight to a presumption of law far beyond the legislative intent, or because of a policy calculated to entrap the witness into statements inconsistent with his own or other witnesses' statements, and then to base an order of exclusion or deportation upon such variances or discrepancies as are reasonably to be expected in all human testimony either due to lack of memory, to temporary forgetfullness, to lack of observation, or to inattention to questions, or to a failure to fully appreciate their force or significance. When this policy is accompanied by a separate examination of witnesses, without previous knowledge of the subject of interrogation, it is certain that discrepancies will be developed as the minutia of daily life. If such unavoidable and inevitable variances are utilized arbitrarily to justify a rejection of the direct testimony of witnesses and to justify an order of exclusion, the apparent fairness of the proceedings merely gives a judicial color to an obvious and predetermined injustice. The records of cases that have been before the courts already in this and other circuits indicate a fixed policy of the Department of Labor to minutely examine and cross-examine the applicant and his witnesses, and to base the order

of exclusion of the applicant upon contradictions developed between the applicant's own witnesses, without seeking for confirmation or contradiction from other witnesses, except as their testimony is recorded in the files of the Department of Labor. This policy is made even more clear by an annual report of the Commissioner General of Immigration for 1928, in which he states:

" * * * .The most difficult task confronting immigration officers is the determination of the question of relationship. Since China is the birthplace of these applicants, it is difficult to determine the truth or falsity of asserted relationship. The immigration officers are compelled to subject the applicant and witnesses to long detailed examinations covering not only the question of relationship but all matters of common knowledge between the applicant and his witnesses, concerning which a knowledge or lack of knowledge would show whether the applicant had in fact been a member of his alleged father's household and had resided in the home and village in China as claimed.

" * . * * The question of whether relationship may be determined by examination concerning collateral matters having no direct bearing upon relationship is a vital one, affecting not only individual Chinese applicants for admission but the maintenance of the only procedure which has been found effective in arriving at the truth. * * * "

■ How can we avoid either one of two conclusions? Either the courts should not interfere with the conclusions of the immigration authorities because they are intrusted by Congress with the exclusive power to determine the facts and the credibility of witnesses, and thus with power to reject the testimony of any number of apparently credible witnesses and to decide against them in favor of the presumption that the applicant is not an American citizen, or, on the other hand, for the courts to hold that the testimony of a single credible witness is sufficient in law to overcome that presumption, and that the question of credibility of the witness or witnesses is the only question of fact before the immigration authorities where the testimony is direct and certain as to the fact in issue. The courts have already rejected the first theory above mentioned of allowing orders of deportation of the immigration authorities to stand, where the uncontradicted and unimpeached testimony of witnesses establish the essential fact to be contrary to the legal presumption against citizenship, and have taken the subject up on the same basis as the immigration authorities; that is, that the existence of discrepancies in the evidence in behalf of an applicant will so far justify a decision of exclusion that the courts will not say that there has been a flagrant denial of due process of law, in case of serious discrepancies. But what sort of discrepancies will justify such an order? Are we to say that a discrepancy as to the amount of pavement in front of a house is not a sufficient basis for an order of exclusion, and that one concerning the number of houses in a block, or the number of windows in a house, is a sufficient discrepancy to justify an order of exclusion? The method as ascertaining the credibility of a witness has been known to the law for centuries, and our juries, when called upon to pass upon testimony, are fully instructed thereon. Aside from the appearance of the witness, his demeanor on the stand, and the reasonableness of his testimony, and his character, as determined by his manner of testifying or by evidence of a good or bad reputation, he can only be impeached by evidence of contradictory statements made out of court or in court on material matters. This is the law's method of measuring the credibility of witnesses.

Relationship is not usually proved by physical facts, and never is where the mother does not testify, but by pedigree reputation in the family, and by the conduct of the parties, including the manner in which they live. The fact that a small child lives in the home of its alleged parents and that they maintain toward each other the obligations involved in the relationship is evidence favorable to the issue, and evidence that they did not live together and did not conduct themselves as parent and child is evidence to the contrary. Such evidence is not collateral evidence; it is direct and material evidence on the issue.

■■ It is plain, and has frequently been said, that the immigration authorities are not bound by the strict rules of evidence in their determinations or proceedings. Discrepancies as to numbers of windows in the applicant's home is relevant and material to the question as to whether or not the applicant lived in the family, and thus to the fact of relationship, but, in the absence of conclusive evidence as to the actual fact discrepancies thereon, would be most unsatisfactory as a basis of judging the credibility of a witness. If we have knowledge of the fact, we can weigh the value of evidence at variance with the fact and thus arrive at credibility of a witness. Evidence concerning the town or village of the home is adapted to develop the question as to whether or not the applicant lived in the village and thus in the home from

which he claims to come. But discrepancies here must be of the most unsatisfactory kind upon which to base a finding of the credibility of a witness, and when the cross-examiner and the Board of Inquiry know nothing of the actual facts concerning the village, the result is even more unsatisfactory and inconclusive. It would seem then that the discrepancy in the testimony of a witness, to justify a rejection of the testimony, must be on some fact logically related to the matter of relationship and of such a nature that the error or discrepancy cannot reasonably be ascribed to ignorance or forgetfulness, and must reasonably indicate a lack of veracity. The difficulty in these cases of "discrepancy" is that there is no standard of comparison. The immigration authorities know nothing of the actual facts, but match witness against witness and thus develop inconsistencies. Suppose two witnesses testify that the applicant is the son of an American citizen, but entirely disagree as to some fact concerning the village from which they all claim to come. If both are shown to be wrong in some important and noteworthy feature, it might justify the rejection of the testimony of both; but in the absence of other and affirmative evidence as to the actual fact, how can the testimony of both be rejected? Can we as a matter of common sense reject one because the other has told the truth, and then reject the other also? This seems entirely unreasonable.

Take the case at bar, the father, Gung Sam, and two sons, Gung Tun and Gung Lin, testify that the appellant, Gung You, is the son of Gung Sam; the father and two sons, Gung Lin and Gung Tun, testify that Gung Dock went to school until July, 1927; the applicant testifies that Gung Dock quit school in 1926. Assuming that the witnesses are equally trustworthy, it is clear that we must accept the testimony of the three witnesses as against one, that Gung Dock quit school in July, 1927; but the same process of reason would require us to accept the fact as to which all three agree, namely, that the applicant, Gung You, is the son of Gung Sam. By no process of logic can the disagreement as to the school matter, not only justify the rejection of the testimony of Gung You on that subject, but also the testimony of all three on another subject on which they agree, and on which there is no possibility of a mistake, and which is the ultimate and material fact. The most that

could be logically assumed is that the mistake, or error, of Gung You on the school matter, justifies a rejection of his testimony on the matter of his relationship to his father; but with that evidence rejected we still have unimpaired and unimpeached the testimony of the father, Gung Sam, and of the son Gung Tun, to the relationship and identity of Gung You. Added to that, we have the testimony of two other sons, Gung Lin and Gung Dock, and of two uncles of Gung You, Gung Tun and Gung Leong, that there is a son, Gung You, born to the wife of Gung Sam on February 22, 1915. That is to say, we have the testimony of six unimpeached witnesses to the fact that Gung Sam has a son, born February 22, 1915, and the unimpeached testimony of the father, Gung Sam, and the brother Gung Lin, that the applicant is that son, entirely disregarding the evidence of the applicant, Gung You. Furthermore, the Special Board of Inquiry certifies that the applicant resembles his alleged father and to some extent his brother, that he speaks the same Chinese dialect his family speaks, that he appears to be of the age he claims to be, that all the witnesses agree on the complicated story of relationship and family history, and that their demeanor as witnesses was satisfactory.

The family history of the father, Gung Sam, and of his father, Gung Teung, and mother, Fong Shee, has been known to the immigration authorities for over 20 years and is recorded in the files of the department. Beginning as early as 1905, these records show that the grandparents of Gung You, the applicant, testified that they had lived in San Francisco for 35 years; that is, since 1870. On April 22, 1907, on his return from China, Gung Sam reported to the immigration authorities, under oath, that he had married Chin Shee in China and had a two year old son, Gung Tun. In 1914, on his return from another trip from China, he reported three sons, Gung Tun, Gung Lin, and Gung Dock ("three boys, no girl"). In 1921, on his return from another trip, he reported four sons, Gung Tun, aged 16, Gung Lin, aged 15, Gung Dock, aged 8, and Gung You, aged 7, the present applicant.

To reject the evidence of all these witnesses as to the relationship of the applicant under such conditions, and because of such a discrepancy, is purely arbitrary. The order denying the writ of habeas corpus is reversed.