**MAR GONG**

v.

**BROWNELL, Atty. Gen.**

**No. 13787.**

United States Court of Appeals,
Ninth Circuit.

Jan. 12, 1954.

Theodore E. Bowen, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Clyde C. Downing, Asst., Chief, Criminal Division, Robert K. Grean, Asst., Los Angeles, Cal., for appellee.

Before STEPHENS, ORR and POPE, Circuit Judges.

POPE, Circuit Judge.

This is an appeal from a judgment for the appellee, 109 F.Supp. 821, in an action brought by the appellant under the provisions of § 503 of the Nationality Act of 1940, 8 U.S.C.A. § 903 * (repealed by the Immigration and Nationality Act of June 27, 1952, § 403.) Plaintiff's complaint asserted that he was a citizen of the United States because he was the son of Mar Kwock Tong, an American citizen who has lived and resided in the United States since 1924.[1]

---

\* See 8 U.S.C.A. § 1503.

1. At the time of plaintiff's birth § 1993 Revised Statutes provided: "Sec. 1993.

All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or

There is no question of the citizenship of Mar Kwock Tong; his father had been a natural born citizen of the United States, and he himself was admitted to the United States in 1924. He and his wife both testified that they were married in China in 1918; that their first son was born in 1919 and that appellant was their second son born to them after the father first came to the United States. The appellant himself testified that he was born at a certain village in China on September 13, 1924; that Mar Kwock Tong was his father, and Chin Poy Sue was his mother; that the alleged parents lived together in the village where the plaintiff was born until the time of the father's departure for the United States in 1924; that the father returned to China in 1933 when he moved the family residence to another village. On this occasion it was testified the father remained in China until January, 1935. During this period a third son was born to the same parents and a fourth son conceived. The mother and the third and fourth sons were admitted to the United States in 1948 and reside with Mar Kwock Tong in the Southern District of California. In 1951 the plaintiff applied for admission to the United States as an American citizen but his application was denied and he was ordered excluded after hearings before the Immigration and Naturalization Service. This action followed.

The court made findings of fact and conclusions of law in which it said: "The court does not believe the testimony of the plaintiff or of his witnesses; and there is insufficient evidence to support plaintiff's claim that he is a national or citizen of the United States," and found that plaintiff was not the blood son of Mar Kwock Tong.

Upon this appeal it is argued that such findings are clearly erroneous in that all of the witnesses testified positively that Mar Kwock Tong, admittedly an American citizen, married Chin Poy Sue and that the plaintiff, Mar Gong, was born to that marriage in China as the couple's second child. It is urged that this positive testimony was uncontradicted and we must follow the rule stated in Ariasi v. Orient Ins. Co., 9 Cir., 50 F.2d 548, 551, to the effect that in the absence of contradictory evidence and any inherent improbability in the testimony a court cannot arbitrarily reject the testimony of a witness which appears credible.

This court has had occasion recently to uphold the findings made by the trier of facts which refused to credit a witness' testimony even although that testimony is not contradicted. National Labor Relations Board v. Howell Chevrolet Co., 204 F.2d 79, 86, affirmed Howell Chevrolet Co. v. National Labor Relations Board, 74 S.Ct. 214.[2] Upon the plaintiff's own theory, all of the witnesses who testified on his behalf are in-

may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States."

2. In Dickinson v. United States, 9 Cir., 203 F.2d 336, we applied this ruling to the findings of a draft board. This was reversed in Dickinson v. United States, 74 S.Ct. 152, 157, the court saying: "The court below in affirming the conviction apparently thought the local board was free to disbelieve Dickinson's testimonial and documentary evidence even in the absence of any impeaching or contradictory evidence. * * * However, Dickinson's claims were not disputed by any evidence presented to the selective serv-

ice authorities, nor was any cited by the Court of Appeals. The task of the courts in cases such as this is to search the record for some affirmative evidence to support the local board's overt or implicit finding that a registrant has not painted a complete or accurate picture of his activities. We have found none here. * * * But when the uncontroverted evidence supporting a registrant's claim places him prima facie within the statutory exemption, dismissal of the claim solely on the basis of suspicion and speculation is both contrary to the spirit of the Act and foreign to our concepts of justice."

We assume that the rule just stated applies to findings of draft boards, but not to those of a district court.

terested and when viewed in this light their mere say-so does not have to be accepted. Flynn ex rel. Yee Suey v. Ward, 1 Cir., 104 F.2d 900, 902; Heath v. Helmick, 9 Cir., 173 F.2d 157, 161.

What has caused this court considerable difficulty in the application of the rule just mentioned, is the fact that the trial court in directing the preparation of findings in favor of the defendant, filed an extensive opinion which creates the impression that the findings are predicated upon considerations other than the evidence given in this particular case.

Fairness to the appellant requires us to examine the findings in the light of the court's opinion.[3] The opinion states that the court had tried many similar cases brought by Chinese under § 503; that all those cases followed a certain pattern. The pattern was that the alleged father claimed to have returned to a village in China for the purpose of marriage; that within a year or so a child was born, then following a second conception the father returned to the United States; later application was filed for admittance of sons as citizens by virtue of their being the lawful issue of a father of Chinese ancestry who is himself a citizen. The court then listed what it called "a marked similarity of facts" among all these cases. These included the circumstance that offspring always followed cohabitation with the wife in China; the children are preponderantly male in startling proportions; that although the children came from rural villages with mud and adobe houses poorly lighted and ventilated, and with running water and plumbing unknown, yet all children born survived and none are deformed or ailing. The court pointed out that these are exceedingly unsatisfactory cases to try because the United States Attorney has no way to meet the testimony given in support of plaintiff's case; that the Immigration authorities and the State Department are very suspicious of these applicants; and "the government insinuates there has been substitution of children and that the individual before the court is not in truth and in fact the natural son of the alleged father but is, perhaps, a relative substituted for a son (who probably did not survive infancy) solely for the purpose of entry into the United States."

This lengthy discussion of the pattern of proof in cases filed under this section of the statute by other persons of Chinese ancestry would indicate that the court's findings here are based in part upon the circumstances shown in these other cases.

In comparison with most of the other cases mentioned in the court's opinion, the plaintiff here has made what would appear to be a strong showing. Unquestionably the alleged parents are husband and wife; they are the parents of two younger sons who reside with them at Los Angeles where the family is maintained;[4] not only the plaintiff and his father testified that the plaintiff was lawful issue of the father, but the mother testified as well.[5] The court was therefore confronted with testimony by persons admittedly husband and wife that the plaintiff was their son.

---

3. Under Rule 75(g), Rules of Civil Procedure, 28 U.S.C.A., the opinion of the court is required in all cases tried without a jury to be made a part of the record on appeal. That requirement it would appear, authorizes this court to examine the opinion for that purpose. Cf. Loeb v. Columbia Township Trustees, 179 U.S. 472, 481–485, 21 S.Ct. 174, 45 L.Ed. 280, and in Re Forstner Chain Corporation, 1 Cir., 177 F.2d 572, 578, footnote 2. In Takehara v. Dulles, 9 Cir., 205 F.2d 560, this court examined the trial court's opinion for a similar purpose.

4. The alleged parents testified that appellant was not brought to the United States at the time the wife and the two younger sons came because they had been advised, incorrectly, that because he was then over 21 years of age he could not accompany the mother.

5. For a case in which the fact that the mother testified was thought important, see Wong Gum v. McGranery, D.C.N.D. Cal., 111 F.Supp. 114, 116.

On the part of the defendant an effort was made by cross-examination of the plaintiff and his witnesses to turn up discrepancies in their testimony relating to certain details concerning which they had previously been examined at hearings before a Board of Special Inquiry when the Immigration authorities were considering the plaintiff's previous application for admission. Upon such inquiries the witnesses were asked a great many questions about matters not directly related to the issues before the Board but designed apparently to test their recollection as to a multitude of details relating to their family life in China. Thus they were asked to describe the family home in the Chinese village in minute detail,—the construction of the large door of the house; the construction of the smaller door; whether the doors were fastened at night; when the doors were installed; whether a wooden bar was used for fastening; how and of what material the furniture was made; where the meals were prepared; whether the family had a cat or a dog; how long the family had a cat; whether the children played with the cat; whether anyone in the village raised chickens. Apparently no detail of these parties' life in China, whether small or large, was omitted from the inquiries by the Special Board.

It is now claimed that when the record of these earlier examinations is laid alongside of the testimony given in the court below, and when the testimony given on these several occasions by the alleged mother or father is compared with that given by the plaintiff, discrepancies appear which throw doubt upon the veracity of these witnesses. The alleged discrepancies relate to three different matters, namely, some scars on the plaintiff's right forearm; the names by which the plaintiff was called; and the location of the Chinese village and of nearby villages.

We are of the opinion that the defendant has attempted to magnify these discrepancies so as to give them a significance which the record will not sustain.

None of them relate to the basic issue whether Mar Kwock Tong sired the plaintiff. In view of the multitude of details about which inquiry was made, we doubt if any honest witness of average intelligence could survive as exhaustive an examination as this and disclose fewer discrepancies in his testimony.

It may be conceded that if the plaintiff and his alleged mother, Chin Poy Sue, lived in the same village in China they should be able to testify whether the nearby village, separated by a bamboo fence, was ten feet away or whether it was twenty feet away. But if one says ten feet and the other says twenty feet, it does not necessarily follow that one of them has testified falsely. As we recently had occasion to say: "Discrepancies * * * are commonplace in any trial. Discrepancies are more likely to appear in the record of the testimony of the candid witness than in that of an astute perjurer." Palakiko v. Harper, 9 Cir., 209 F.2d 75.

The discrepancy relating to the scars on plaintiff's right forearm arises out of the fact that he had such a scar which came from an accident sustained by him in China after his mother had left that country and had come to the United States. When she was questioned she was asked about a scar on his forearm and whether she had seen it and dressed it and taken care of it. She testified that the plaintiff had received an injury working in the fields at a time after she had come to the United States and when she was not present in China; she learned of this injury from the plaintiff after he reached the United States. She said that when he was small he had received various injuries and had been afflicted with boils; on these occasions she had dressed the sores but that she did not know whether they had left scars. She particularly referred to injuries on the plaintiff's legs. The plaintiff does bear a scar on one of his legs. The record of the trial completely fails to show that the mother undertook to testify that she herself had dressed the in-

jury which left the presently prominent scar on plaintiff's forearm, for she repeatedly explained that she saw this scar first upon the plaintiff's arrival in the United States.

The claimed discrepancies relating to the names by which the plaintiff was known at various times must be considered in the light of the fact that the testimony to which the appellee points was taken by means of some nine different interpreters, and when the names are rendered into English, the diversity may be more apparent than real. Thus, one interpreter reports the name given as "Quong", another as "Kwong", and another as "Gong". These may well be separate renditions of the same Chinese expression. It appears that according to Chinese custom, the plaintiff was known by different names at different times. The witnesses agree that the name which plaintiff took upon his marriage was "Mar Wan Au", but some of the interpreters render this as "Mar Wing Ow". It appears from the testimony of the alleged father that plaintiff was first known as Mar Kwong (or Gong) Ying, but on the father's direction, when plaintiff was five or six years old he was called "Mar Gong". He then acquired the marriage name mentioned above. The appellant himself also testified before the Board of Special Inquiry that he had sometimes been called "Mar Wei Gong". He also said to that Board, contrary to what his father had testified, that during his school years he also used the name of Mar Gong Ying. Before that Board the alleged mother had testified that she herself had given appellant his name of Mar Gong at the time of his birth. However, the appellant testified that his grandmother had given him the name of Mar Gong Ying. Before that Board the alleged father also testified that the grandmother gave this name which the father ordered changed to Mar Gong later.

As for the Chinese village, it is asserted that the alleged father testified that the village to which his family was moved in 1933 was "Git Lung Village", and that this was known as the new village and that there was an old Git Lung Village about ten feet distant from the new village. Before the Immigration authorities he had at one time testified that there was an old Git Lung Village and at another time that there was not an old Git Lung Village. As between the alleged mother and the plaintiff there is a discrepancy as to the name of the other village,—whether it was known as the old village or by some other name, and whether it is ten or twenty feet away from the village in which the plaintiff lived.

The court's opinion indicates that it did not regard these discrepancies as particularly significant or controlling. The court said that it would feel suspicious if no discrepancies had developed for innocent misrecollection is not an uncommon experience.[6] As for differences between the testimony of the alleged father and that of the other two, it must be borne in mind that the former was not in China during most of the period inquired about. His differing recollection could be an honest one.

This court has had occasion to deal with situations in which the testimony of witnesses respecting facts at issue has been rejected because of discrepancies relating to such collateral matters. In Gung You v. Nagle, 34 F.2d 848, we characterized such rejection by the immigration authorities as "purely arbitrary" and overturned their findings.[7]

---

6. The court said: "A discrepancy in any case is a poor crutch on which to lean, and in these cases discrepancies are unreliable. Because of the difference in customs between the two races involved, the looseness with which terms are employed by Chinese and the difficulty of interpretation, innocent discrepancies may creep into the record. In some cases two Chinese interpreters were present in court, and they themselves could not agree as to what the witness said." [109 F.Supp. 823.]

7. 34 F.2d at page 853 "The difficulty in these cases of 'discrepancy' is that there is no standard of comparison. The im-

In accord: Louie Poy Hok v. Nagle, 9 Cir., 48 F.2d 753; Young Len Gee v. Nagle, 9 Cir., 53 F.2d 448; Nagle v. Jin Suey, 9 Cir., 41 F.2d 522.

What seems to us to be most important here is that in their answers concerning the great multitude of details as to which no discrepancy developed, the witnesses disclosed evidence that they were all describing and were all familiar with the same places and events.

It must be realized that this particular plaintiff may in fact be the lawful issue of a citizen father. However much fabrication or falsification the court may have found in its experience in the trial of other similar cases, we think it would be unjust to put what happened in those cases in the scale against this appellant.

█ We recognize all that may be said with respect to the necessity of the court guarding against imposition, but we also are of the view that no special quantum of proof should be exacted from any person claiming American citizenship merely because of his racial origin. In Kwock Jan Fat v. White, 253 U.S. 454, 464, 40 S.Ct. 566, 570, 64 L.Ed. 1010, the Supreme Court, reversing this court, said: "It is better that many Chinese immigrants should be improperly admitted than that one natural born citizen of the United States should be permanently excluded from his country."

█ The situation here is in many respects similar to that which confronted us in Takehara v. Dulles, supra, in which we reversed the judgment of the trial court denying a similar application for adjudication of citizenship for the reason that we were convinced that the trial court in making its findings had done so in reliance upon considerations which in our opinion should have carried no weight in that particular case. Similarly we think that the court here should not have given weight to its experiences, unfortunate as they may have been, in other cases, in arriving at its findings with respect to this appellant. Each case should be allowed to stand upon its own bottom.

The judgment is reversed and the cause is remanded with directions to make findings as to whether the appellant is the child of Mar Kwock Tong within the meaning of § 1993 of the Revised Statutes, such findings to be made in the light of what is said in this opinion.

migration authorities know nothing of the actual facts, but match witness against witness and thus develop inconsistencies. Suppose two witnesses testify that the applicant is the son of an American citizen, but entirely disagree as to some fact concerning the village from which they all claim to come. If both are shown to be wrong in some important and noteworthy feature, it might justify the rejection of the testimony of both; but in the absence of other and affirmative evidence as to the actual fact, how can the testimony of both be rejected? Can we as a matter of common sense reject one because the other has told the truth, and then reject the other also? This seems entirely unreasonable."