## NATIONAL LABOR RELATIONS BOARD v. NORTHWESTERN MUT. FIRE ASS'N et al.

### No. 10521.

Circuit Court of Appeals, Ninth Circuit.

May 24, 1944.

Alvin J. Rockwell, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Ida Klaus, and Isadore Greenberg, Attys., National Labor Relations Board, all of Washington, D. C., and Maurice J. Nicoson, Regional Atty., National Labor Re-

lations Board, of Los Angeles, Cal., for petitioner.

Corwin S. Shank, H. C. Belt, and Jo D. Cook, all of Seattle, Wash. (Shank, Belt, Rode & Cook, of Seattle, Wash., of counsel), for respondents.

Before STEPHENS and HEALY, Circuit Judges, and FEE, District Judge.

HEALY, Circuit Judge.

This is a petition of the National Labor Relations Board for the enforcement of an order entered upon the Board's determination that respondents had engaged in unfair labor practices affecting commerce.[1] No jurisdictional problem is involved. We briefly summarize the facts as recited in the findings. Naturally the testimony was in conflict at a number of points and differing inferences may be drawn from it, but the findings appear to have support in the record.

One Sylvester, a salaried salesman of respondent insurance companies, undertook to organize a union of the home office employees as an affiliate of the American Federation of Labor. The work of recruiting membership proceeded quietly and with a considerable measure of success. Plans were announced for the holding of a general meeting of all employees at a local (Seattle) hotel on the evening of December 4, 1940, for the purpose of perfecting the organization. When news of the proposed meeting reached the respondents' governing staff directions were given to two supervisory employees—the assistant treasurer and the personnel manager—to attend and report their observations to Mr. Brill, the secretary of the companies. The two appeared at the meeting, at which a large group of employees were in attendance as was also a representative of the AFL. During the course of the meeting the two supervisors were requested to leave and did so. Following their departure a number of those present signed membership application cards.

Next morning the supervisory employees reported the results of their surveillance to the governing staff, giving the names of those present at the meeting and describing its course. The staff then directed to the various department heads a written notice stating that if their views were asked with reference to the forming of the union the reply was to be that "under the law the company is not permitted to give advice on the subject." The notice was not, however, publicly posted nor does it appear to have been otherwise communicated to the employees themselves.

During the course of the morning of December 5th Crisman, the sales agency manager, was informed by Sylvester of the formation of the union. When told who some of the joining members were Crisman observed to Sylvester, "you sure got a low-minded bunch in that union." This conversation was shortly reported to Fletcher, Crisman's superior in the agency department, and later to respondents' secretary, Brill. Fletcher at once telephoned Sylvester's wife and brother in a patent effort to exert outside pressure on Sylvester. The wife in effect declined to intercede, but the brother, who was an attorney representing several insurance companies, immediately got in touch with Sylvester and sought to persuade him to drop the union, saying that a continuance of his activities would embarrass the brother. The pressure, so the Board found, was renewed later in the day through respondent Greenwood, the manager of the building occupied by respondent companies. Greenwood appears to have gone to considerable lengths, by threats and otherwise, to dissuade Sylvester from further participation in the union movement and his efforts were not without the desired effect. In the course of the evening Greenwood telephoned Brill at the latter's home stating, in substance, that Sylvester was at his office, that he, Sylvester, had been doing some work "that he was not particularly proud of and that he wanted to come out and make amends and apologize and forget the whole business." Brill assented to the proposed visit of the two men and at Greenwood's telephoned suggestion had a fire lit in the fireplace when they arrived. At the session of the three in Brill's house Sylvester produced the union cards signed by some 95 employees and burned all but a few of them in the fireplace.

From the testimony relating to the session in Brill's home it is plain that this high official was aware of the pressure being exerted by Greenwood upon Sylvester and that Brill did nothing to discourage it. As Sylvester was leaving the house Brill patted him on the back and told him to forget it, "that we all make mistakes some

---

[1] National Labor Relations Act § 10(c), (e), 29 U.S.C.A. § 160(c), (e).

time or other." There is undisputed evidence that Greenwood had long been closely associated with the officials of respondent companies and was deeply in the latters' debt financially and otherwise. The Board inferred, and the inference is a fair one, that Greenwood's activities in squelching Sylvester had Brill's approval and at least his passive cooperation. Since Greenwood was found to have acted in the interest of the companies, the Board determined that he was an employer within the meaning of § 2(2) of the Act, 29 U.S.C.A. § 152 (2).[2]

With the collapse of Sylvester the unionization movement subsided, and there followed immediately a counter drive to set up an independent association among the employees. The Board found that the establishment of the latter association was aided by the respondents' demonstrated antagonism toward the AFL union and its leader and by their active assistance in soliciting members for the association; also that the administration of the socalled independent union was completely dominated and controlled by representatives of the respondents. We will not stop to discuss this phase of the case in detail. Enough to say that the Board's finding has substantial support in the record. The management's attitude toward these two essays in the field of self-organization was markedly different, the first movement receiving the treatment already described whereas the second was given every encouragement. The propriety of the order requiring the disestablishment of the association, as well as the propriety of the cease and desist order, is not open to serious doubt.

We have felt some hesitation as to a third provision of the order. This relates to the reinstatement of an employee named O'Connell. O'Connell had been in the employ of respondents since 1934, and for more than four years had been assistant cashier of the companies. He was one of the leaders—second only to Sylvester—in the abortive AFL movement. In January 1941, with the establishment of the independent association or company union, O'Connell became chairman of a small remnant still adhering to the AFL group. In the spring of that year he was transferred to the auditing department over his protest that he had no training in

that work and that his transfer would result in loss of compensation he had been receiving for overtime. Thereafter the post of assistant treasurer became vacant several times, but requests of O'Connell to be restored to the post were disregarded. There is no evidence that O'Connell had not performed efficiently the duties of assistant treasurer, and it is clear that his removal from that position was a demotion. The Board inferred that he had been demoted and refused reinstatement because of his lack of interest in the independent association and because of his activities in behalf of the AFL union. We think the inference is substantially supported.

When the present proceeding was being heard before an examiner O'Connell was called as a Board witness and testified in a manner unfavorable to the respondents. On cross examination he was asked whether he had not, a few days earlier, supplied a list of the names and addresses of company employees to one Hughes, an AFL organizer. He denied having done so. He also said that he had had nothing to do with the sending of notices for a proposed meeting of the AFL. After the noon recess O'Connell returned to the stand at his own request and stated that, in the interest of shielding a fellow employee who had aided him, he had earlier given incorrect testimony; that he had in fact submitted an employee mailing list to an AFL organizer named Lamberton; that he had compiled the list in part from a file in the mailing room of the respondent companies; and that Lamberton had used the list in the mailing notices of a meeting at which the existing of employee association was to be attacked as company-dominated.

Next morning Brill summoned O'Connell and informed him that he was being discharged immediately, Brill stating that he would not "tolerate an untruthful employee in my office." The following day Brill recalled O'Connell and said "I want you to know that we are not dismissing you because you told a lie in court; but the reason is because you gave information in our records to others."

From the evidence before it the Board was not persuaded that the list obtained and given out by O'Connell was in fact confidential matter. It found that in any event "the unexplained inconsistency of

2 Cf. N. L. R. B. v. Long Lake Lumber Co., 9 Cir., 138 F.2d 363.

the respondents' reasons for discharging O'Connell negatives the claim that he was discharged for either of these reasons," and that his employment was terminated because the companies had learned from his testimony that he "was taking an active part in the [AFL] Union's attempt to revive interest among their employees." Respondents were ordered to reinstate O'Connell upon request and to make him whole for any loss of pay he might have suffered by reason of his discharge.

On the whole record we are not able to say that the finding is unsupported or the order improper. It is the province of the Board, not of the courts, to determine what affirmative action will effectuate the policies of the Act.[3]

Decree will be entered enforcing the Board's order in all respects.

[3] NLR Act § 10(e), 29 U.S.C.A. § 160 (e). Compare N. L. R. B. v. Weyerhaeuser Timber Co., 9 Cir., 132 F.2d 234; N. L. R. B. v. Willard, 68 App.D.C. 372, 98 F.2d 244.