**NATIONAL LABOR RELATIONS BOARD v. SAN DIEGO GAS & ELECTRIC CO.**

No. 13525.

United States Court of Appeals Ninth Circuit.

June 25, 1953.

George J. Bott, Gen. Counsel, NLRB, David P. Findling, Asso. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Fannie M. Boyls, Thomas R. Haley, Washington, D. C., and George H. O'Brien, Los Angeles, Cal., for petitioner.

Luce, Forward, Kunzel & Scripps, San Diego, Cal., for respondent.

Before DENMAN, Chief Judge; ORR and POPE, Circuit Judges.

ORR, Circuit Judge.

March 31, 1952, petitioner entered a cease and desist order pursuant to § 10(c) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 160(c), requiring respondent to refrain from certain specified acts and to take affirmative action which petitioner found would effectuate the policies of said Act. Petitioner is seeking enforcement of its orders. Respondent urges us to deny enforcement because as it asserts, the findings upon which petitioner relies to support its order are not supported by substantial evidence.

Respondent is a California public utility corporation engaged in supplying illuminating gas and electricity for industrial, commercial, and domestic use to the residents of the City and County of San Diego, California. It is admitted that respondent is engaged in commerce within the meaning of the Act.

The trial examiner found and, for the most part, petitioner relied on the following facts:

Cosby M. Newsom, a former employee of respondent and against whom the charged unfair labor practice is alleged to have been directed, was one of five instrument technicians employed by respondent. Respondent had a union contract with many employees. Instrument technicians were not covered by that contract. In August or September, 1950, Newsom returned from a trip to Los Angeles. He informed his fellow technicians that higher rates of pay were received by instrument technicians employed in the same industry in Los Angeles. The opinion was expressed by one member of the group that the higher wage obtaining in Los Angeles was due to the fact that the workers there were unionized. A discussion was had as to the advisability of having the Union represent them as a bargaining agent.

A few days prior to January 15, 1951, on reporting for work, Newsom and two

other instrument technicians informed Harold L. Warden, instrument engineer, and their immediate superior, that the instrument technicians felt they should receive a raise in pay and were considering asking the Union to represent them. Warden expressed sympathy with the idea and informed them that he would aid them in furthering their union program. Warden contacted two other instrument technicians and informed them that their only chance of securing higher wages was through union representation and that he would assist them in getting it.

Warden contacted Kalins, his immediate superior, a safety engineer, and informed him of the instrument technicians' plans to join the Union. Warden and Kalins contacted Hathaway, superintendent of the electrical department, Kalins' immediate superior. Hathaway requested a meeting with the instrument technicians. It was held later that day. Present were Hathaway, the five instrument technicians, Warden and Kalins. Hathaway inquired who was the employees' spokesman. He was informed that no selection had been made. Hathaway inquired whether the efforts of the five employees to get union representation was prompted by any grievance other than the wage question. He was informed that there was none. Hathaway expressed the opinion that the men should have sought wage increases through normal company channels rather than attempting to enlist the aid of the Union and informed them that had they done so he would have given the matter speedy consideration but that inasmuch as the company's contract with the Union had more than a year to run he doubted whether the Union could get the men any relief for a long period of time. Hathaway stated that he had no objection to the men joining the Union but thought that respondent's top management might object, stating several reasons why he thought they would do so.

The instrument technicians decided to have the Union represent them. A request for representation was formulated, copies of which were sent to the Union and one to respondent's vice-president in charge of operations. Upon arriving at the plant the morning following the distribution of the request, Warden made a statement to Newsom and Fowler as follows:

"* * * our [instrument technicians] position didn't look too good, and that if he [Warden] were in our shoes he would get these affairs in order because there is a possibility we may all be looking for other jobs."

Other statements were made by Warden to the different instrument technicians at different times, such as: "* * * that the instrument technicians would find it difficult to obtain employment as instrument technicians elsewhere because Warden doubted whether they had the necessary qualifications to combat the competition they would encounter; that * * * they would meet with strong opposition in their organizational move." This testimony was given credence by the trial examiner over contradictory testimony by Warden. The statements made by the officials of respondent were construed by the men as meaning they would lose their jobs if they continued their union activity.

"Hathaway testified, and his testimony with respect to this meeting is in substantial accord with the testimony of the others present, that after Kalins and Warden had concluded their presentation of a proposed training program for the instrument technicians and the plan had been unanimously approved, he inquired of Kalins and Warden how the instrument technicians were performing their tasks; that Kalins and Warden replied that all were doing satisfactory work except Newsom; that he then asked each person present for his opinion of Newsom's work; that each replied it was not satisfactory and each added that in his opinion Newsom 'would not become a satisfactory instrument man and should not be in the training course which was about to start'; that he then posed the question: 'Should we terminate Newsom?'; that each person replied in the affirmative; and that he thereupon instructed Kalins to discharge Newsom.

"On January 31, Newsom, accompanied by Warden, went to Kalins' office where

Newsom was informed by Kalins, 'you can apply for a transfer to another department through personnel, you can resign and probably get letters of recommendation, or we will terminate you within two weeks.' When Newsom asked Kalins the reason for the aforesaid action, Kalins stated that Newsom's services were unsatisfactory and then proceeded to enumerate certain incidents which occurred during his tenure of employment. After a brief discussion regarding the said incidents, Newsom requested Kalins to call a meeting of all the instrument technicians and to inform them of the disciplinary action and the reasons therefor. When Kalins asked the purpose of such an unusual procedure, Newsom replied that the other men 'were in the middle of a move to organize' and therefore the action taken against him had 'a bearing on the rest of the members of the department'. Thereupon, Kalins summoned the other four men to his office, informed them of the action taken against Newsom, and then stated the purported reasons therefor. Despite Newsom's detailed explanation that the incidents cited for his seeming neglect of duty took place over a three-year period, that none was of recent date, that he previously had satisfactorily explained to Warden's superiors, at the time Warden complained to them about the incidents, that the incidents were of little or no consequence. Kalins remarked that Newsom could no longer remain in the department. Kalins refused to recede from his adamant position to rid his department of Newsom even though, in response to his invitation to the instrument technicians to express their views with respect to the said disciplinary action, Fowler said, to quote Kalins, 'something to the effect that the men were all together in this thing and that he felt in his (Fowler's) own mind that the company possibly was trying to fire Newsom in order to break up their attempt at unionization; that they could, therefore, take it to the National Labor Relations Board.'

"Newsom refused to resign or to request a transfer to another department. On February 15, the respondent, because Newsom refused to take the aforesaid action, discharged him."

Respondent produced testimony supporting its discharge of Newsom on grounds other than his union activities. The trier of the facts gave credence to the evidence supporting the union activity charge.

Respondent insists that it discharged Newsom because his work was unsatisfactory. The fact that Newsom had been in the employ of respondent for the greater part of three years and was discharged two weeks after his union activities began of itself makes the discharge of Newsom suspect. By this we are not suggesting that suspicion alone can sustain a charge of unfair labor practices.

The acts of omission and commission which respondent allege as motivating it in discharging Newsom extend over a period of three years. He, Newsom, was in the employ of respondent for nearly three years, holding a position of an instrument technician during practically all of the time. He had become, at the time of discharge, senior technician. During this period of job tenure, especially during the early part of his employment, officials of respondent expressed satisfaction with Newsom's work:

"John T. Hardway, respondent's efficiency engineer until the end of August 1950 when he re-entered the United States Navy, * * * [upon returning] to visit the plant in December 1950, he told Newsom: 'It looks like this war may involve us too, and if you and the rest of us return, remember this, Newt, there is a place for you in the instrument department. I don't care whether you go back in the Merchant Marine, the Navy, or what, but there is a place for you in the instrument department.'

"Station Chief Campbell, * * * told Newsom about a week before the effective date of Newsom's discharge that he should not be 'broken hearted' over his plight, adding that he, Campbell, had recommended Newsom very highly a year or so before and was sure that Newsom would make his mark in the world, for Newsom

was strong, versatile and able. Respondent's respect for Newsom's ability as a technician was likewise displayed around the first of 1951, 'before respondent learned of Newsom's leadership in the union movement. Warden assigned Newsom to certain 'routine' work, explaining that he disliked burdening Newsom with that type of work but Newsom was the only man in the department capable of doing that work satisfactorily."

The faults found with Newsom's work, with the exception of alleged errors in the preparations of some records, did not occur near the date of discharge. The most recent derelictions charged were not discovered until after discharge; manifestly these could not have figured in the cause of discharge.

Warden, Newsom's immediate superior, in 1951 informed Newsom that he was the only man who could handle routine work at both stations and Newsom was selected to instruct Webb in the routine work at one of the stations.

As hereinabove pointed out, Hardway, at one time an efficiency engineer for respondent, in December, 1950, assured Newsom that there would always be a place for him in the instrument department. Hardway later was one of the officials who criticized Newsom's work.

Hathaway testified that he decided to discharge Newsom because of the unfavorable reports given him at the January 30 meeting. Respondent urges that these reports were the motivation for Newsom's discharge by Hathaway, but this contention loses its force in the face of Hathaway's testimony that before that date he had asked permission from Noble to discharge Newsom. This discussion between Hathaway and Noble occurred on or about the time respondent first learned of Newsom's union activity. This evidence in addition to the statement by Noble that the company might have objections to the technicians joining the Union and the statement of Warden that the technicians might have

to look for new jobs is substantial. From it, and other evidence hereinbefore detailed, petitioner could reasonably draw the inference that the reason for Newsom's discharge was his union activities.

Respondent correctly asserts that under the requirements of the Labor Management Act of 1947 appellate courts are required to take a "new look" in determining whether substantial evidence exists to support a finding. It is no longer sufficient if some substantial evidence exists. Such evidence must withstand scrutiny with an eye focused on its relation to all the evidence in the record.[1] Of course this does not imply that we are to judge the credibility of witnesses. That function still remains with the trier of the facts.[2] In the instant case, as in most contested cases, we are called upon to consider conflicts in the testimony given by opposing witnesses. Even though we would have, had we been the trier of the facts, resolved the conflict differently, we cannot do so as a reviewing court.[3] The testimony supporting the petitioner's orders is not inherently improbable nor is the evidence produced by respondent so overwhelming as to render the testimony on which petitioner relies untrustworthy. Reviewing the whole record we are not left with a conviction that a mistake has been made.

Respondent urges that petitioner erroneously relied on statements made by Warden because he, Warden, was not in a position to bind the respondent. The activities of Warden in association with other officers of respondent conclusively show that he was acting for respondent and with its full knowledge. He was the go-between; he carried the messages and was present at and took part in the discussions which culminated in the discharge of Newsom.

We have given consideration to respondent's arguments that an employer has a right to discharge for any cause except for union activity; that union activity does not protect employees; that a wide

1. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

2. See Note 1.
3. N. L. R. B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511.

latitude should be accorded an employer in the matter of discharge. These arguments are pertinent in the consideration of the record as a whole in making a determination as to whether substantial evidence exists to support the findings of petitioner. In our opinion these considerations do not drain the findings made by petitioner of substantiality. Respondent stresses the argument that in discharging Newsom it was acting in the interest of the general public in removing from its working force an incompetent man, whose careless work in an important job might produce power failure and thus occasion loss and inconvenience to thousands of people. That argument does not ring true. The danger, if such it was, must have been apparent and more acute during the three years of Newsom's employment. Experience must have made him more competent as the years went by. Why did respondent so suddenly stress this danger so near the time Newsom began his union activities?

The order of enforcement is granted.