**NATIONAL LABOR RELATIONS BOARD**

v.

**RADCLIFFE et al.**

**No. 13726.**

United States Court of Appeals
Ninth Circuit.

March 3, 1954.

As Modified on Denial of Rehearing
April 27, 1954.

**310**

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Arnold Ordman, H. T. Herrick, Attys., NLRB, Washington, D. C., for petitioner.

Eli A. Weston, J. L. Eberle, Boise, Idaho, for respondents.

Before DENMAN, Chief Judge, POPE, Circuit Judge, and DRIVER, District Judge.

DRIVER, District Judge.

The National Labor Relations Board petitions for enforcement of its order, based upon findings that respondents C. W. Radcliffe and W. W. Mancke, co-partners doing business as Homedale Tractor & Equipment Company, engaged in unfair labor practices. Specifically, the Board's findings are that respondents interfered with union organizational activities of its employees by the strategically timed announcement of a profit-sharing plan, interrogated an employee regarding his and other employees' union sympathies, and threatened to close their establishment, if it were unionized, all in violation of Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1); and discriminatorily discharged, for their union activities, five employees, in violation of Section 8(a) (1) and (3) of the Act, 29 U.S.C.A. § 158

(a) (1) and (3). The Board's order directs respondents to cease and desist from engaging in such unfair practices, to offer re-employment to the three employees, not previously reinstated, and to make whole all five discharged employees for any loss of pay they may have suffered.

No jurisdictional issue is raised, as respondents concede and the record shows that they were engaged in commerce, within the meaning of the Act. The basic question presented is whether, considering the record as a whole, there is substantial evidence to support the Board's findings.

In June, 1951, respondents were engaged in the farm machinery and equipment business, in Homedale, Idaho, a town of 1500 to 2000 population, about forty-five miles from Boise. They had in their employ five mechanics and a number of set-up and delivery men, engaged in repair and maintenance work—just how many, the record does not show. Wilbur M. Snyder, a mechanic, and eight other men who worked with him in respondents' shop met at Snyder's residence, in Homedale, on the evening of June 4, to discuss unionization. Snyder, previously had obtained from the International Association of Machinists, hereinafter called the Union, blank authorization cards, and all of the men who attended the meeting signed the cards, authorizing the Union to represent them for collective bargaining purposes.

On June 13, there was another meeting at Snyder's home, attended by the men at the first meeting, except George Otto. Robert E. Watkins, a set-up and delivery man and Allen K. Walker, business agent of the Union, at Boise, also were present. Walker talked to the men about the operation and advantages of the Union, and unionization was further discussed. Watkins, at that time, signed an authorization card.

On the evening of June 20, respondents, called a meeting of their employees, at their place of business. Such meetings, previously, had been held at odd times, on the average of once or twice a month.

Respondent Radcliffe, in giving advance notice of the meeting of June 20, told one of the mechanics it was absolutely necessary to be there. He told other employees that they should let nothing short of a death in the family prevent them from attending. At the meeting, Radcliffe spoke concerning a profit-sharing plan, which he explained with the aid of a mimeographed statement, copies of which were passed out to the men. The statement set forth the plan in detail in nine numbered paragraphs. It was headed, "An Incentive Award Plan for Employees of Homedale Tractor & Equipment Company," and, in the first paragraph, stated: "We are pleased to announce the details of an employees' 'profit-sharing plan', retroactive to January 1, 1951." The plan provided that the Company's employees were to share in the net profits under certain specified conditions. The division of profits was to be made quarterly, on March 31, June 30, September 30, and December 31 of each calendar year. At the end of each quarter, profits allocated to the program were to be set up in two reserves, one-half to be "paid out immediately" and the other one-half to be held until the end of the year, when it would be distributed along with the fourth quarterly payment.

Checks for the quarter ending March 31 were handed out to the eligible employees present at the meeting. The checks were in substantial amounts. Snyder received $47.00 or $49.00 for his one-half, quarterly payment. No other payment was ever made to the employees under the plan. Radcliffe testified that, upon the advice of an attorney, payments were "suspended," for the reason that rulings of the Wage Stabilization Board indicated that they "were not within the law." On December 24, 1950, respondents had told their employees that a profit-sharing plan was being considered, but apparently nothing was done about it, and no further information regarding

it was given to the men until the meeting of June 20.

After he had explained the profit-sharing plan at the meeting, on June 20, Radcliffe admonished the employees for slackness in their work, discourtesies to customers, and whisperings among themselves, particularly "during the past two weeks." He warned them that, if things did not improve, the guilty ones would be discharged. He said that they had a stack of applications about an inch thick and could replace any or all of the men at any time, if they did not "attend to business." Respondent Mancke then addressed the meeting and, in a loud and angry manner,[1] accused the employees of wasting time, visiting and talking and "fooling around," and threatened to "get tough," if conditions did not improve. Both Radcliffe and Mancke said that Watkins, who was not invited and did not attend the meeting, would be discharged the following day for his failure to perform a certain job of work.

Watkins had been employed on May 1, 1951, on a temporary, "trial basis" for three months. On June 20, he had steam-cleaned a mower, but had missed some spots on the under side. When Mancke inspected it, he told Watkins that it was not clean enough to be painted and would have to be done over. It was then only ten or fifteen minutes before quitting time, and Watkins said that he would "get it the first thing" the following day. Mancke left without further comment.

Snyder, Maybon, and Watkins reported for work at the usual time the next morning, but, because of their resentment at what had happened at the meeting the previous evening, decided to go to Boise to confer with the Union's business agent, Walker. Snyder went to the office to tell Radcliffe that he would not be working that day, but Radcliffe was not in and, after waiting for him for fifteen or twenty minutes, Snyder left. He and Maybon then picked up their

1. Snyder testified that "he [Mancke] was yelling at us that night, and you could have heard him, I think, about three-fourths of a city block, and all of us sitting right there close to him."

tools and, accompanied by Watkins, who had no tools, went to Boise. They did not tell Howard Wilkin, the foreman, who was in the shop that morning, that they were leaving. In Boise, Walker heard what they had to say and advised them to return to work. All of them did report for work the next day, June 22. Some time during the forenoon, Radcliffe called Snyder to the office and asked him why he had not worked the day before. Snyder told him that he was so "mad at what had happened at the meeting, he was in no condition for work and, after reporting at the shop, had changed his mind and had gone home. Radcliffe said that he would "think it over" and call Snyder back to the office that afternoon. He told Snyder to go back to work in the meantime.

The same forenoon, Maybon, together with the foreman Wilkin, was summoned to the office. Radcliffe asked Maybon why he "hadn't been there" the previous day, and the latter said that it was on account of the meeting—he did not like to have people yell and scream at him. Radcliffe said, "How do we stand?" Maybon replied, "If it goes on like this, why, I will find something different." Radcliffe asked Maybon to work the rest of the day and get his check that night. Radcliffe also said that he should have let Maybon go three months earlier, because Maybon and the Company "couldn't see eye to eye."

Also, on the morning of June 22, Watkins was called to the office. Radcliffe told him that, since he could not see "eye to eye" with the Company and couldn't seem to get along "with them," he should not work there any more. He was, thereupon, discharged. That afternoon, Radcliffe told Snyder he had "fired" Maybon and Watkins, but had decided to keep Snyder on, as his work had been satisfactory, and that Snyder could keep his job with the Company as long as he wished to do so.

On June 25, respondents received from the Union a letter informing them that the Union represented the majority of respondents' employees. The next day, Mancke called the employees together, read the letter, and remarked that it was up to them to decide whether or not they wanted the Union.

■ On June 27,[2] respondent Radcliffe summoned to the office Robert D. Stimmel, an employee who had attended the two union meetings in Snyder's home and had signed a union authorization card. Radcliffe told Stimmel that he knew about the meetings the employees had held and said it wasn't necessary to have spies—things just got around. He also said he knew that Jack Thomas left a meeting early "to pick up his wife"[3] and that he thought Wilbur Snyder was the "head of the business" and a troublemaker. Radcliffe said "four more guys" would be discharged and asked Stimmel how he felt about the Union and how the other employees felt about it. Stimmel was noncommittal. He said that he could get along with a union or without one, and that he did not know how "the other fellows" felt about the Union.

On the same day, June 27, about five minutes before quitting time, Radcliffe called Snyder to the office, handed him a check, and told him that, after thinking it over, they had decided to let him "go too," as he did not seem to be in sympathy with the Company. The next day, June 28, at about 5:45 P.M., Radcliffe called Jess Runger to the Company office and said to him: "Did you ever cut your arm off before?" To which Runger replied, "No, and I haven't right now that

---

2. Stimmel had considerable difficulty fixing the date of his conversation with Radcliffe. However, it appears that a short time after it occurred, he had made a written statement in which the date was mentioned. After he had been recalled as a witness and had examined the statement to refresh his memory, he testified that the date was June 27. The Board found that to be the date of the conversation, and we have followed the Board's finding in our factual summary.

In this connection we regard as erroneous the Board's acceptance of the Trial Examiner's finding that respondents had knowledge of the employees' actions in creating a union merely from the fact "that the employees had held two organizational meetings in a small community." The Board's finding of such knowledge in Radcliffe is sufficiently based on Stimmel's testimony.

3. Thomas did, in fact, leave the June 4 meeting early to meet his wife at a picture show.

I know of." Radcliffe then said it was a hard thing to do, but, since Runger could not be in sympathy with the Company and satisfied with what he was getting, they were going to give him an opportunity to get a new job. Runger was then handed his pay check. About seven o'clock that evening, Ernest Runger, who had just returned from Boise, was asked by Radcliffe to come to the Company office. Respondent Mancke also was in the office. Runger asked what was the reason for his "getting fired," and Mancke said he was sorry that it had to happen; that Runger's work had been satisfactory and they "had gotten along nicely," but that Runger must be dissatisfied with his job, since he had asked for more money, and they were going to let him get a job where he could make more money.

On July 7, each of the Rungers received a letter from respondents asking them to return to work on July 10. After the parties had signed an instrument, dated July 9, which stated that the Rungers were "still in favor of the Union to represent us" and that Radcliffe and Mancke would "rehire them" with "all back pay for lost time," both of the Rungers resumed their employment, as requested.

■ In arriving at its conclusion, the Board was not obliged to consider the facts and incidents just related separately and in isolation. It had a right to consider them compositely and to draw inferences reasonably justified by their cumulative, probative effects.[4] So considered, the timing of respondents' activities with reference to their employees was, we think, highly significant.

The Union meetings, attended by nine of respondents' employees, were held on June 4 and June 13, 1951. Among those who attended and signed union authorization cards, Ernest Runger had been in respondents' employ since August, 1948; Jess Runger, since October, 1948; Maybon, since January, 1950; Snyder, since March, 1950, except for several

months in the fall of 1950; and Watkins, since May 1, 1951. All were permanent employees, except Watkins, who was hired for a trial period of three months. So far as the record shows, none of them had been reprimanded or criticized by his employers. A pay raise had been given to Maybon on April 1, 1951, and to Jess Runger on June 1, 1951. In the short space of seven days, from June 22 to June 28, respondents discharged all five of the men above named.[4a] The discharges conformed to the same general pattern; they were made summarily and without prior warning. The reasons respondents gave, according to the employees' testimony at the hearing, before the examiner, were: that Watkins and Maybon could not see "eye to eye" with the Company; that Snyder did not seem to be in sympathy with the Company; that Jess Runger was not in sympathy with the Company and was not satisfied with what he was earning; and that Ernest Runger had, previously, asked for a wage increase and, therefore, must be dissatisfied with his job. Snyder and Ernest Runger, each, was told by one of his employers, a short time before his discharge, that his work had been satisfactory.

■ In the proceedings before the Board, respondents gave various, inconsistent reasons for discharging five of their workmen in a single week. In their answer to the complaint, they alleged that the two Rungers were and, "except for a short period," had been, at all times, in their employ; that Watkins, "having been hired on a temporary basis only," ended his employment on June 22, 1951; and that Maybon and Snyder had voluntarily quit their employment, taking their tools "from the employer's premises" and leaving without notice. At the meeting of June 20, Radcliffe and Mancke joined in the announcement that Watkins would be fired the next day for his failure to steam-clean a mowing machine properly. In his testimony before

---

**4.** Canyon Corp. v. N.L.R.B., 8 Cir., 128 F.2d 953, 955.

**4a** Respondents did not discharge a single non-union employee.

the examiner, Radcliffe said that Watkins and Maybon had been discharged for "taking French leave." Although both of them testified at the hearing, respondents did not offer any explanation why Jess and Ernest Runger had been discharged. The failure to give a reason, or the giving of evasive, inconsistent, or contradictory reasons by management for the discharge of employees, properly, may be considered by the Board, as it was in the instant case, in determining the real motive which actuated the discharges.[5]

Jess and Ernest Runger were discharged on June 28, after respondents had actual notice of union activity in their shop. The two workmen were re-employed on July 10, it is true; but the respondents offered the re-employment on the advice of their attorney. It was good advice. The discharges of the Rungers could not reasonably be explained on any basis other than that of union activity. If they quit or were let out because of a disagreement over wages, as respondents now contend on this appeal, it hardly seems likely that the Rungers would have been reinstated in their jobs within two weeks, at the same wages and with an agreement that their employers reimburse them for their back pay.

Although respondents informed their employees, on December 24, 1950, that they were considering the adoption of a profit-sharing plan, nothing further was done, and no additional information was given to the workmen regarding it until after the unionization meeting of June 13. Within a few days thereafter, the men were notified to attend a Company meeting on the night of June 20. They were told that nothing short of a death in the family should keep them away. At this meeting, a profit-sharing plan was announced, "retroactive to January 1, 1951," and an elaborately detailed, mimeographed statement of the plan was distributed to the employees present.

No explanation was offered by respondents as to when the details of the plan had been worked out, or when they had been written up and mimeographed. According to the plan, a payment to the employees was to be made "immediately," at the end of each quarter, but the payment for the quarter which ended March 31 was not made until June 20. No other payment, under the plan, was ever made to the employees.

On June 27, two days after respondents had been notified by the Union that it represented a majority of their workmen, Radcliffe called employee Stimmel to the office and talked with him about union activities in the shop. Radcliffe not only said that he knew about the Unionization meetings, but he related an incident which indicated that he had accurate, detailed information as to what had transpired at the first meeting. He said he thought that Snyder was the leader of the unionization movement and displayed his hostility to the Union by referring to Snyder as a "troublemaker" and to his union activities as "the trouble." Radcliffe's statement to Stimmel, in the course of their conversation, as to what action the former had taken or was about to take, that "four more guys" would be discharged, plainly implied that Watkins and Maybon had been fired on June 22 on account of their union activities and that more of the same kind of discharges would follow. When Radcliffe, thereafter, asked Stimmel what he and his fellow-workmen thought about the Union, the interrogation was, necessarily, coercive and an unwarranted interference by the employer with the workman's right of free choice to make or to maintain union affiliation. It is worthy of note that Stimmel adopted a noncommittal, conciliatory attitude by assuring Radcliffe that he could work without, as well as with, a union and that he was not discharged.

5. N.L.R.B. v. Yale & Towne Mfg. Co., 2 Cir., 114 F.2d 376, 378; N.L.R.B. v. Condenser Corp., 3 Cir., 128 F.2d 67, 75; N.L.R.B. v. Northwestern Mutual Fire Ass'n, 9 Cir., 142 F.2d 866, 868–869; N.L.R.B. v. International Furniture Co., 5 Cir., 199 F.2d 648, 650.

■■ The two respondents were the only witnesses who testified in their behalf. They denied that they had interfered in any way with unionization in their shop, and they specifically denied that they had any knowledge of union activity on the part of their employees prior to June 25. But the trial examiner, whose report and findings were adopted by the Board, did not credit their testimony.[6] Although the determination whether there is substantial evidence to support the Board's findings of fact must be made on the basis of consideration and appraisal of the record as a whole,[7] that does not mean that we are obliged to give weight to testimony which the Board, in the rightful exercise of its functions as arbiter of the facts, rejected as not worthy of credit.[8] And the Board rightfully may decline to credit the testimony of interested witnesses, even though such testimony is not contradicted.[9]

■ The announcement of the profit-sharing plan on June 20 and the discharges of Watkins and Maybon on June 22 can not be regarded as unfair labor practices on the part of respondents, unless it be assumed that they then knew of the union activities of their employees. There is no direct evidence of knowledge in the record, but if the circumstances are such as to support a reasonable inference, the Board may find knowledge from circumstantial evidence.[10] At the meeting of June 20, respondents criticized and upbraided their employees for work slackness, lack of attention, and misconduct in the performance of their duties during the preceding two weeks, a period which, roughly, coincided with the union organizational activities of the employees. Respondent Radcliffe testified that the shop mechanics actually had engaged in the objectionable practices and deserved to be "bawled out." On the other hand, two of the discharged workmen testified that there had been no such misconduct and, hence, the criticism was unwarranted. It was the function of the Board to resolve the conflict; but we think the lack of corroboration of respondents, under the circumstances, weighs heavily in favor of the testimony of the employees. Respondents' shop foreman, Howard Wilkin, was in an excellent position to know whether or not the shop mechanics had been "laying down on the job" during the two weeks prior to June 20. He did not participate in any union activities; it appears that he was friendly to and in sympathy with his employers; but they did not call him as a witness to corroborate Radcliffe's testimony as to the workmen's misconduct, although the record indicates that he was present at the examiner's hearing. To all the other attendant circumstances, discussed above, indicative of knowledge, we may then add the justifiable assumption that, at the meeting of June 20, respondents were angry and displeased with their employees for no apparent, good reason and criticized and "bawled them out" for work negligence and misconduct of which they were not, in fact, guilty.[11]

6. The following is a quotation from the findings of fact of the trial examiner:
Respondents testified that neither knew of the employees' activities on behalf of the Union until June 25, the day they received the letter announcing that the Union represented a majority of the employees. This testimony is not credited. The demeanors of Radcliffe and Mancke, while they were on the witness stand, evidenced to the undersigned that they were withholding the true facts regarding the controversy.

7. 29 U.S.C.A. § 160(e), and Universal

Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

8. N.L.R.B. v. San Diego Gas & Electric Co., 9 Cir., 205 F.2d 471, 475.

9. N.L.R.B. v. Howell Chevrolet Co., 9 Cir., 204 F.2d 79, 86; See also Mar Gong v. Brownell, 9 Cir., 209 F.2d 448.

10. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368; N.L.R.B. v. Abbott Worsted Mills, 1 Cir., 127 F.2d 438, 440.

11. We are not impressed by the argument that, if they had known of the union activ-

■ It is our conclusion that, considered as a whole, the record affords substantial support for the Board's findings that respondents engaged in unfair labor practices, in violation of Section 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) and (3).[12] We make this one exception. We find no support in the record for the finding that respondents threatened to close their business, if it became unionized. The direction to the respondents in the Board's order to cease and desist from that practice should be deleted. The form of notice attached to the order as an appendix should be, correspondingly, amended.

As thus modified, the Board's order will be enforced.

POPE, Circuit Judge (concurring).

To my mind it is clear that there was basis in the record for a finding that employee Snyder was discharged for his union activity. This happened, as Judge Driver's opinion shows, on the evening of June 27, after the employer Radcliffe's talk with Stimmel, which was after the employers received the union's letter informing them of their claim of representation.

But I have had great difficulty in finding any evidence whatever that on June 22 when Maybon and Watkins were discharged, the employers knew that concerted activity to organize a union was afoot. The Examiner drew an inference to this effect from the fact that this was a small community, evidently on the assumption that in a town of that size everyone knows everyone else's business, an interesting but wholly novel and insupportable rule of evidence.[13] The fact that the Board, as it had the right to do, refused to credit the testimony of the employers that they did not know of the union activity, is no proof that they did. Belief that a witness is lying is not a substitute for evidence that the opposite of his testimony was the fact. A witness who testified that a horse was white, in a manner and with such demeanor as to convince the tribunal that he is testifying falsely, does not thereby furnish proof of an allegation that the horse was black. A district court, furnished with nothing better than that, would have to direct a verdict against its proponent. Cf. Dyer v. MacDougall, 2 Cir., 201 F.2d 265, 269.

To my mind the events of June 20, taken together, disprove the Board's charges. I cannot think the Board could seriously believe that in order to influence the men respecting their concerted activities the employers, on that very evening, both wooed the men with bonuses and abused and insulted them with accusations "in a loud and angry tone of voice". And consider also the fact that when Maybon and Watkins, on June 22, were discharged for having taken their tools and left without notice the day before, Snyder, who had done the same thing, was kept on when he told a tale about having gone home. Surely this would indicate that it was not then known that Snyder had been organizing a union.

Hence, on that much of the record, I would think the order for reinstatement of Maybon and Watkins could not be sustained. However, there is one further aspect of the testimony which leads me, although with considerable hesitation to conclude that there was one bit of evi-

---

ities of their employees, respondents, in all probability, would not have given them a pay bonus and, at the same meeting, verbally abused and upbraided them. The "stick-and-carrot" technique, that is to say, the use of a combination of censure and cajolery, of threats and promises, is a well known and commonly employed method of influencing action in police circles and elsewhere.

12. N.L.R.B. v. A. S. Abell Co., 4 Cir., 97

F.2d 951; N.L.R.B. v. Laister-Kauffmann Aircraft Corp., 8 Cir., 144 F.2d 9; N.L.R.B. v. W. T. Grant Co., 9 Cir., 199 F.2d 711; N.L.R.B. v. San Diego Gas & Electric Co., 9 Cir., 205 F.2d 471; N.L.R.B. v. West Coast Casket Co., 9 Cir., 205 F.2d 902.

13. Under Title 29, § 160(b), the Board's proceedings must measure up to "the rules of evidence applicable in the district courts".

dence of knowledge on the part of the employers at those earlier dates. I think the Board could believe that Radcliffe, in his conversation with Stimmel, was trying to create the impression that the employers had known all along, and at the time of the meetings, what was going on. This was evidently his purpose in showing off what he knew about Jack Thomas leaving the meeting, and in saying it wasn't necessary to have spies. True, a literal reading of the testimony does not show that Radcliffe said, in substance, "I knew of your meetings when they were held", but the effort to convey such an impression could be inferred. And if he was trying thus to convey that impression, I think that it amounted to an admission to the same effect. An admission of such prior knowledge would of course be sufficient to support the finding.