**SHATTUCK DENN MINING CORPORA-
TION, (IRON KING BRANCH),
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 20131.

United States Court of Appeals
Ninth Circuit.

May 9, 1966.

Ralph B. Sievwright, Twitty, Sievwright & Mills, Phoenix, Ariz., for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Marion Griffin, Attys., N. L. R. B., Washington, D. C., for respondent.

Before HAMLEY, KOELSCH and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

■ The National Labor Relations Board adopted the findings of its trial examiner and held that petitioner (Shattuck) had violated sections 8(a) (1) and 8(a) (3)[1] of the National Labor Relations Act (29 U.S.C. § 158(a) (1) and (3)). Shattuck seeks to set the Board's order aside; the Board seeks enforcement. The sole question presented is whether "[t]he findings of the Board * * * [are] supported by substantial evidence on the record considered as a whole * * *." (Section 10(e), 29 U.S. C. § 160(e)). If so, those findings are "conclusive." We hold that the findings are supported. It follows that the Board's order should be enforced.

Four incidents gave rise to this case. We consider them separately.

1. *The discharge of Olvera.*

For some years the employees of Shattuck, which operates the Iron King mine in Arizona, have been represented by unions, from 1946 to 1958 by the Federal Labor Union, and from 1958 to April 1964 by the Steelworkers Union. On March 25, 1964, the International Union of Mine, Mill and Smelter Workers won a Board-conducted election and became the bargaining agent, certified on April

1. "Sec. 8. (a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 * * *.
    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

Section 7 provides:
    "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." (29 U.S.C. § 157.)

2, 1964. Olvera, an employee of 9 years standing with an unblemished record, was active in support of the new union. Within a week after the union was certified, it supplied Shattuck with a list of temporary officers, including Olvera, who was designated as vice president, steward, and member of the grievance committee. During the next two weeks a number of grievances were submitted, and Olvera was active in presenting them. Bargaining between the company and the union had not yet begun, but was imminent.

The incident upon which Shattuck based Olvera's discharge occurred on April 21. The stated ground was refusal to obey an order of his supervisor, Channon, and interference with an order given by Channon to another worker, Portugal. Both Olvera and Portugal testified, in substance, that Olvera did not refuse to obey Channon's order, or interfere with Channon's order to Portugal, and that Channon, for no apparent reason, picked on Olvera, using obscenities, giving him an unpleasant duty, and threatening more. Channon did not report the incident to his superiors. He was not called as a witness.

Olvera filed a grievance against Channon with the union, reading:

> "The foreman using abusive language and threatening complainant, an officer and steward of local union, union requests that this foreman be reprimanded and this practice stopped immediately."

On April 22 at the close of a meeting of the union grievance committee with Shattuck's manager, Kentro, at which Olvera was present and took an active part, the union president presented this grievance to Kentro. Kentro asked the mine superintendent, Sundeen, to investigate the matter and report back. Sundeen and Channon submitted written reports on the basis of which Kentro says that he acted. Yet the reports were not produced, nor were Sundeen or Channon called by Shattuck as witnesses. The next grievance meeting was on April 28. Kentro opened the meeting by remarking that the union was turning in too many small grievances, and that he did not like it. Olvera's grievance was discussed, and he, Portugal and Channon stated their versions. Kentro announced that he would sleep on the matter. The following morning, April 29, Olvera was handed a discharge slip dated April 28, signed by Kentro, and stating the grounds of discharge.

On the day of Olvera's discharge a new grievance was prepared by the union, protesting his discharge and asking his reinstatement with back pay and full rights restored. A meeting was scheduled on this grievance for May 4, a Monday. Strike action, if the grievance were not satisfactorily adjusted, was voted on May 3. At the May 4 meeting, Kentro again heard from Olvera and Portugal, but refused to permit union representatives to question Channon, and sustained the discharge. There is also evidence that, in another case of claimed insubordination, Kentro looked into the matter more thoroughly and refused to discharge the employee, in rather marked contrast to what he did in Olvera's case.

In his decision, the trial examiner reviewed the evidence in detail and found that Olvera was not insubordinate, that Kentro had no reasonable ground to believe that Olvera was insubordinate, that the stated grounds for discharge were a pretext, and that the real motivation was to discourage the union's filing of grievances and its aggressive pursuit of bargaining. He concluded that the discharge was discriminatory, in violation of section 8(a) (3), and constituted restraint and coercion, in violation of section 8(a) (1).

These findings are vigorously attacked, and heavy reliance is placed on cases indicating that the mere fact that good cause for a discharge does not exist is not a basis for inferring that the discharge was based upon an unlawful motive,[2] that the fact that an employee is

---

2. NLRB v. Rickel Bros., Inc., 3 Cir., 1961, 290 F.2d 611, 614; NLRB v. McGahey, 5 Cir., 1956, 233 F.2d 406, 413.

engaged in union activity is not, taken alone, proof that the discharge was for that reason,[3] that suspicion is not enough to support a finding,[4] that an employer may discharge for any reason or no reason and so has no burden to justify his action,[5] that inferences must be based upon evidence,[6] that it is not the job of the Board to judge the severity of punishment imposed by the employer,[7] that lack of anti-union bias is to be considered in the employer's favor,[8] and that the Board may not infer an unlawful motive if the evidence equally supports an inference of lawful motive.[9] A recent decision of this court, reversing the Board, relies upon some of the language of some of these cases. Lozano Enterprises v. NLRB, 9 Cir., 1966, 357 F.2d 500.

The Board, in support of the findings, cites cases indicating that it is for the trial examiner and the Board to resolve conflicts in the evidence and pass upon the credibility of witnesses,[10] that inferences drawn by the Board are strengthened by the fact that the explanation of the discharge offered by the employer fails to stand scrutiny,[11] that the Board may consider facts and incidents compositely and draw inferences reasonably justified by their cumulative effects.[12]

Many more cases could be cited in which the courts have used various expressions and stated various reasons in upholding or refusing to uphold the findings of the Board. There is more than enough scripture upon the subject to enable any devil to cite some of it for his purpose.[12a] We think it quite unnecessary to discuss, much less to try to reconcile, all of the statements made by various judges on the subject, or even all of the statements appearing in the opinions in the cited cases. The statute commands that we examine the record of each case to ascertain whether the findings of the Board are supported by substantial evidence on the record considered as a whole. This is not always easy, and judges may, and sometimes do, disagree about the result. On its facts, each case is unique.

■ We are to respect the duties of the trier of fact to decide whom to believe, to reconcile conflicting evidence, and to draw such inferences as the evidence reasonably supports. And we are told by the Supreme Court, in no uncertain terms, that "There is no place in the statutory scheme for one test of the substantiality of evidence in reinstatement cases and another test in other cases." (NLRB v. Walton Mfg. Co., 1961, 369 U.S. 404, 407, 82 S.Ct. 853, 855, 7 L.Ed. 2d 829.) [13] The statute also commands

---

3. NLRB v. Citizen-News Co., 9 Cir., 1943, 134 F.2d 970, 974.

4. NLRB v. Montgomery Ward & Co., Inc., 8 Cir., 1946, 157 F.2d 486, 491.

5. NLRB v. Ace Comb Co., 8 Cir., 1965, 342 F.2d 841, 847; NLRB v. McGahey, supra n. 2.

6. NLRB v. Kaiser Aluminum & Chem. Corp., 9 Cir., 1954, 217 F.2d 366, 368.

7. NLRB v. Ace Comb Co., supra n. 5; NLRB v. Audio Indus. Inc., 7 Cir., 1963, 313 F.2d 858, 861–863; Osceola County Co-op. Creamery Ass'n v. NLRB, 8 Cir., 1958, 251 F.2d 62, 66; NLRB v. McGahey, supra n. 2; NLRB v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567, 572–573; NLRB v. Montgomery Ward & Co., supra n. 4.

8. See Pacific Gamble Robinson Co. v. NL RB, 6 Cir., 1950, 186 F.2d 106, 109.

9. NLRB v. Huber & Huber Motor Express, Inc., 5 Cir., 1955, 223 F.2d 748; see NLRB v. Arthur Winer, Inc., 7 Cir., 1952, 194 F.2d 370, 374.

10. Bon Hennings Logging Co. v. NLRB, 9 Cir., 1962, 308 F.2d 548, 554; NLRB v. Davisson, 9 Cir., 1955, 221 F.2d 802, 803; NLRB v. San Diego Gas & Elec. Co., 9 Cir., 1953, 205 F.2d 471, 475.

11. NLRB v. Griggs Equip., Inc., 5 Cir., 1962, 307 F.2d 275, 278; NLRB v. Radcliffe, 9 Cir., 1954, 211 F.2d 309, 314; NLRB v. Dant, 9 Cir., 1953, 207 F.2d 165, 167.

12. NLRB v. Radcliffe, supra n. 10, at p. 313.

12a. "The Devil can cite scripture for his purpose." (Merchant of Venice, Act 1, Sc. III, 1. 99, William Shakespeare.)

13. Walton was decided in 1961, and expressly disapproved of a special rule that had been developed in the Fifth Circuit for such cases. We note that some of the cases most heavily relied upon by Shat-

that the Board consider whether the employee was discharged for cause.[14] As stated in NLRB v. Ace Comb Co., supra n. 5, the applicable legal test is this:

"It has long been established that for the purpose of determining whether or not a discharge is discriminatory in an action such as this, it is necessary that the true, underlying reason for the discharge be established. That is, the fact that a lawful cause for discharge is available is no defense where the employee is *actually* discharged because of his Union activities. *A fortiori*, if the discharge is *actually* motivated by a lawful reason, the fact that the employee is engaged in Union activities at the time will not tie the employer's hands and prevent him from the exercise of his business judgment to discharge an employee for cause." (342 F.2d at 847.)

Actual motive, a state of mind, being the question, it is seldom that direct evidence will be available that is not also self-serving. In such cases, the self-serving declaration is not conclusive; the trier of fact may infer motive from the total circumstances proved. Otherwise no person accused of unlawful motive who took the stand and testified to a lawful motive could be brought to book. Nor is the trier of fact—here the trial examiner—required to be any more naif than is a judge.[15] If he finds that the stated motive for a discharge is false, he certainly can infer that there is another motive. More than that, he can infer that the motive is one that the employer desires to conceal—an unlawful motive—at least where, as in this case, the surrounding facts tend to reinforce that inference. Here was a new union, just certified, and quite busy in advancing grievances; here was an officer of that union who was also a shop steward and an active member of the grievance committee; here was such an employee presenting a grievance, on his own behalf, against his supervisor. The inference that his discharge was motivated by a desire to discourage such union activity is by no means without basis. It seems to us a reasonable one to draw. We conclude that the findings are supported by substantial evidence on the record considered as a whole.

2. *The posted notice.*

The grievance meeting at which Olvera's grievance was discussed was on April 28, he was discharged on April 29, and a new grievance, based upon discharge, was to be heard on May 4, a Monday. On Friday, May 1, the following notice, signed by Kentro and addressed to all employees, was posted on the bulletin board:

"This notice to all employees at this operation is being made because of rumors which have come to our attention that there may be an *attempt by some employees to stop the operation of the Iron King Mine in the near future*. The Company wishes to state that *operation* and *production* will continue at the Iron King. In order to avoid any misunderstanding, the Company hereby *notifies you* that each employee is expected to report for work at his regularly scheduled work shift time, unless he has an excused absence permit signed or approved by both his Department Head and the General Manager. Employees *failing to report for work will be considered as having quit* and will be dropped from the pay-

---

tuck are from that Circuit and were decided before Walton. Cf. Bon Hennings Logging Company v. NLRB, supra; NLRB v. Mrak Coal Company, 9 Cir., 1963, 322 F.2d 311, 313.

14. § 10(c), 29 U.S.C. § 160(c):
"No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause."

15. "Judges are apt to be naif, simpleminded men, and they need something of Mephistopheles." (Holmes, Law and Court, in Speeches, 102 (1913); "Credulity is not esteemed a paramount virtue of the judicial mind." (Huston, J., in Rankin v. Jauman, 1895, 4 Idaho 394, 401, 39 P. 1111, 1113.)

roll, unless they have obtained the excused absence permit referred to above." (Emphasis as it appears in the original.)

The trial examiner found that, by posting the notice, Shattuck violated Section 8(a) (1) of the Act. This finding, too, is vigorously attacked. Kentro testified that from the time the union had won bargaining rights there had been rumors of a strike. He knew that a union meeting to consider action relating to the discharge of Olvera had been called for Sunday, May 3. He knew that the new grievance relating to that discharge was to be heard on May 4. He said that the purpose of the notice was merely to reiterate Shattuck's long established absenteeism rule. But, as the trial examiner correctly found, the notice laid down requirements considerably more stringent than those of the long established rule. We agree with the trial examiner that "Employees * * * would reasonably construe this [notice] to constitute a threat of discharge if they should * * * strike." [16] It was much more than a mere transmission of information that, if employees struck, they might face replacement.

### 3. The strike.

At the conclusion of the May 4 grievance meeting, when Kentro announced that he was standing by his decision, the chairman of the union committee replied that they would "have to settle this on the picket line." The strike began the next day. The mine continued to operate, although a majority of the employees struck, and Shattuck began to replace the strikers. On May 8, the union filed with the Board a complaint based upon Olvera's discharge. On May 11, company and union representatives met with a federal conciliator in an effort to settle the strike. The effort failed. The union then called off the strike and the strikers made an unconditional offer to return to work. Shattuck, however, refused to reinstate 19 strikers who had been replaced. The strike was caused by the discharge of Olvera. Because his discharge was an unfair labor practice, the strike was an unfair labor practice strike and the Board properly ordered reinstatement.[17]

### 4. The discharge of Jaime.

On May 9, Kentro discharged Jaime, a striker, for threatening Rivera, a non-striker. The evidence, however, supports the finding of the trial examiner that Jaime did not threaten Rivera but only tried to persuade him to join the strike. This was a protected activity. In such a case, even if Kentro reasonably believed that Jaime had threatened Rivera, the discharge was in violation of section 8(a) (1):

"In sum, § 8(a) (1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct."

\*　　\*　　\*　　\*　　\*　　\*

\* \* \* "A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith."

(NLRB v. Burnup & Sims, Inc., 1964, 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed. 2d 1.)

The petition to set the order aside is denied.

The order will be enforced.

16. NLRB v. West Coast Casket Co., Inc., 9 Cir., 1953, 205 F.2d 902, 905; see NLRB v. McCatron, 9 Cir., 1954, 216 F.2d 212, 215; cf. NLRB v. Globe Wireless, Ltd., 9 Cir., 1951, 193 F.2d 748, 750.

17. See n. 16, supra.