NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

U. S. DIVERS COMPANY, Respondent.

No. 17704.

United States Court of Appeals
Ninth Circuit.

Oct. 8, 1962.

**900**

Stuart Rothman, General Counsel, Dominick L. Manoli, Assoc. General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, and Joseph C. Thackery, Attorneys, National Labor Relations Board, Washington, D. C., Ralph E. Kennedy, Regional Director, National Labor Relations Board, Los Angeles, Cal., for appellant.

Potruch & Lerten and Erwin Lerten, Los Angeles, Cal., for appellee.

Before STEPHENS, BARNES and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

Before us is a petition of the National Labor Relations Board (hereinafter called "the Board"), pursuant to Section 10 (e) of the National Labor Relations Act as amended (61 Stat. 136, as amended by 73 Stat. 519, 29 U.S.C.A. § 151 et seq.), for enforcement of its order issued on October 13, 1961 against U. S. Divers Company (hereinafter referred to as "U. S. Divers" or "the Company"). The Board's decision and order are reported at 133 NLRB No. 88. This court has jurisdiction as the alleged unfair labor practices occurred at the U. S. Divers plant in Santa Ana, California, where the Company is engaged in the manufacture and sale of diving equipment.

The Board, in agreement with the Trial Examiner, found that the Company violated Section 8(a) (1) of the National Labor Relations Act by interrogating its employees in respect to their membership, activity, or interest in the General Truck Drivers, Warehousemen & Helpers Union Local 235 (hereinafter called "Teamsters Union"), by inducing its employees to favor and to propagandize the United Rubber, Cork, Linoleum and Plastic Workers of America, AFL-CIO (hereinafter called "Rubber Workers Union") in preference to the Teamsters Union, and by urging upon its employees a Company-supported representation plan for collective bargaining despite the pendency of a Teamsters Union representation petition before the Board. The Board also found that the Company vio-

lated Section 8(a) (3) and (1) of the Act by discharging employee James Sutton because of his activities on behalf of the Teamsters Union.

The facts upon which the Board's findings are based appear in petitioner's brief. This statement of facts presents the resolution of conflicting evidence made by the Trial Examiner and adopted by the Board. Such statement of facts to which the Company takes no serious issue is as follows:

"On the evening of April 20, 1960, three Teamster organizers met with a number of Company employees, including James Sutton, at the home of employee William Lollis. Sutton signed a Teamster authorization card at this meeting and, because he was janitor and 'had a place to hide' them, took from 40 to 50 cards with him for the purpose of obtaining employee signatures preparatory to the filing of a Teamster representation petition with the Board. The next day, April 21st, Sutton secreted the cards behind toilet articles in a supply room adjoining the men's restroom, both of which spaces were his responsibility as janitor. During the morning he persuaded eight or nine employees to sign cards and hid these cards on the same shelf in a separate pile along with his stock of unsigned cards.

"Employee Wade Walker, having heard before coming to work on April 21st that Sutton possessed Teamster authorization cards, told Sutton at the beginning of the workday that he 'wanted one' and would 'see [him] at break time' in order to sign a card. As Walker had promised, when morning break time came, he sought out the janitor in the restroom, and along with another employee whose name Walker did not recall, asked Sutton for a card to sign. Sutton unlocked the supply room, admitted the two employees, took two cards from their hiding place and gave one to each employee. As he did so, however, he looked

through the open supply room door and observed Production Manager Nyquist standing in the adjacent restroom. Sutton thereupon immediately walked out of the supply room into the restroom and shut the intervening door, leaving Walker and the other employee, whose name he could not recall, in the supply room. Nyquist, however, at once inquired, 'What's going on here?' and, telling Sutton to follow him, immediately went to the supply room door, unlocked it and confronted Walker and his companion, again asking what was 'going on.' Nyquist had one key to the supply room door, while Sutton had the only other. Walker replied that he was in search of a light bulb and the other employee declared that he was 'looking for a smock.' Nyquist told both to 'return to [their] areas,' that he would 'deal with [them] later.' Nyquist then turned his attention to Sutton, asked if he did not 'like working for this Company any more' and what his 'beef' was. Sutton replied that the Company was 'fine' except for its 'starvation wages' and Nyquist replied with the warning that 'there's going to have to be some changes made * * *' and that he would talk to Sutton later. Shortly thereafter (according to Sutton, just before lunch), Nyquist sent Sutton on an errand to the Company offices to provide the stenographers with dustrags. As Sutton returned to the supply room, he saw Nyquist and Alfred Bennett, Sutton's maintenance supervisor, emerging from the supply room 'grinning very broadly.' Sutton immediately went to his cache of cards, where he found the toilet articles and cards in disarray, and some of the signed cards mixed in with the unsigned. About 3:00 P.M. that afternoon Nyquist told Sutton he was discharged and when Sutton asked why, Nyquist replied, 'You know why.' Nyquist then ask-ed Sutton to return his key to the supply room and when Sutton said he wanted to go there to pick up his belongings, Nyquist went with him. Sutton then secured his lunch pail, and as he picked up the authorization cards from behind the toilet supplies, Nyquist looked at the cards and said, 'Now you know why.' Shortly after this conversation, Sutton punched out and left the factory.

"Either later that same day or the next, Nyquist called Walker, a subforeman but not a supervisor, to his desk and, after a preliminary question of a casual nature about Walker's work, asked him 'if there was anything else he had to tell him' and when Walker replied, 'You mean about the Union?' Nyquist answered, 'Yes.' When Walker suggested a preference for the Teamsters, Nyquist declared that he had seen places that were 'a lot worse off than we were' and that he 'hated to see the Teamsters Union get in.'

"On May 9, 1960, the Teamsters filed its representation petition with the Board. Several days later the Company's traffic manager, Edwin Swan, asked employee Lollis what he 'thought of' the AFL-CIO (i. e., the Rubber Workers Union) and whether he had considered what that union could do for the employees. The next day Swan made virtually the same inquiry of Lollis and another of Swan's shipping department employees, William Zuniga. Lollis in turn asked why the Company was trying to promote the Rubber Workers and Swan replied that he thought it was a 'better union.' He also remarked that he had once worked for a firm that had a 'company contract' with its employees and that the arrangement had 'worked well.' Swan remarked at one point that he would 'like to see somebody push the AFL-CIO.' He also asked Lollis and Zuniga why the employees were complaining and they answered that

there was dissatisfaction over wages and overtime and that personal grievances existed.

"Soon after the Teamsters' petition had been filed, and about the same time that Swan spoke to Lollis and Zuniga, Production Manager Nyquist approached employee Calvin Kirby in the latter's work area and, after telling him that he had something 'important' to discuss with him, drew him to one side away from other employees and asked him if he knew that there was a 'union trying to come in here.' Kirby was in charge of five or six work tables in an assembly area. Nyquist then launched into a denunciation of the Teamsters in which he stated that the Teamsters were 'crooks,' that there was 'corruption all through their ranks' and that 'Hoffa had more power than the President.' He also told Kirby that 'he wouldn't want to give any of his money to a crook like that.' Nyquist then told Kirby that he 'wanted to see the right union get in' and that 'the CIO [Rubber Workers] was the right union.' Nyquist then suggested that because Kirby's job permitted him to 'roam freely' through the plant, he should tell the employees that the 'CIO is the best union' and that he should 'convince [them] to vote for the CIO and at the same time to run down the Teamsters.' He then told Kirby that he should see subforeman Merv Carney, get CIO union cards from him and pass them out among the workers as Carney was doing. Kirby went to Carney and discussed the matter, but did not take any cards from the subforeman.

"Shortly after Swan's conversation with Lollis and Zuniga, and Nyquist's with Kirby, an organizational meeting of employees interested in the Rubber Workers was held at the home of Maintenance Supervisor Bennett. This meeting resulted in a Rubber Workers representation petition, filed with the Board on May 18, 1960, but withdrawn 2 days later.

"About 2 days after withdrawal of the Rubber Workers' petition (i. e., about May 22nd), Nyquist called to his desk a number of the subforemen in his production department and suggested that the employees 'could try to get bargaining power' and enter into a 'contract' with the Company. He informed them that other departments of the Company were going to elect representatives to meet with Vice-President Wheeler, and that he wanted his department to do the same. Foreman Swan simultaneously suggested to his shipping department employees that they also elect a representative to meet with Wheeler. These instructions by Nyquist and Swan resulted within several days in an election by secret ballot of four 'representatives': Ruth Carey, Harold Williams, Wade Walker, and William Zuniga. About June 1st, while the Teamster petition was still pending, Nyquist provided a private office for the use of the representatives, who drew up a list of employee grievances. The representation hearing was held June 8th and that matter is still before the Board pending the outcome of this case.

"Later the same day, at the instance of Nyquist, the committee met with Vice-President Wheeler. The representatives asked Wheeler what he proposed to do for the employees. Wheeler replied that if he were in their places he would 'be asking for better wages, better working conditions, better retirement plans and so forth.' He added that although he was making no commitments, he agreed that the Company 'could very well raise the level of * * * wages' and that 'some of the working conditions were not the best.' He went on to say that when 'the present turmoil' was over whether the employees decided to bring in a union or to do their own bargaining with the company, through their own representatives, they would find the Company 'very cooperative.'

"Immediately after the session in Wheeler's office, Nyquist again summoned Walker, provided paper and a typewriter and instructed him to prepare election ballots bearing the inscription 'union contract' and 'company contract.' He then told Walker to meet with the production employees, inform them of what Wheeler had said, make his own appropriate remarks and then, as Nyquist put it, 'we would have an election.'

"Still later in the day, the four committee members, Mrs. Carey, Williams, Walker, and Zuniga, went from department to department describing the meeting with Wheeler, quoting his remarks and telling the employees to indicate their choice between 'union contract' and 'company contract' by marking the ballots which the committee gave them and dropping them into a box provided for the purpose. The vote completed, the box was taken to Swan's office where the ballots were counted in the presence of Supervisors Swan and Nyquist and the committee. A majority selected the 'union contract' choice."

The Company's specification of errors is presented in its brief under four points.

Under the first point, the Company contends that it was denied a fair and impartial trial because of certain rulings made by the Trial Examiner during the course of the trial which were sustained by the Board upon consideration of the exceptions filed to the intermediate report of the Trial Examiner. The principal objections to the conduct of the hearing relate to two rulings.

■ The first ruling arose on cross-examination of the Board's witness James Sutton. He testified at some length concerning the meeting held on April 20, 1960, to which reference has previously been made. On direct examination, he testified that the meeting was held in a private home and that there were present three organizers from the Teamsters Union from one of whom he received the Union's authorization cards. Upon cross-examination, counsel for the Company was permitted to elicit from the witness the name of the employee at whose home the meeting was held, the names of the three Union organizers, the name of the Union's organizer who gave to the witness 40 or 50 of the Union's authorization cards, and the statement that the witness signed one of the authorization cards at the meeting. Upon interrogation as to the names of the other persons present at the meeting, the Board's counsel objected on the ground that disclosure of such names might lead to reprisals from which such persons should be protected. The Trial Examiner sustained the objection on the ground that the question asked was not within the scope of direct examination since the witness had not testified that there were others present at the meeting other than the three Union organizers and the witness. Counsel's stated purpose in seeking the name of others present at the meeting was that if given the names of such other persons, he might be able to produce them as witnesses and such persons might testify that Sutton did not get any of the Union's authorization cards at the meeting, and thus impeach the testimony of the witness Sutton. In the course of his ruling, the Trial Examiner stated that he felt warranted in confining the issues to the witness' direct examination. Following such ruling, the Company's counsel moved to strike the testimony on the ground that his cross-examination had been unduly restricted. The Trial Examiner stated:

"* * * I will not permit you to find out what employees were present at this meeting who were not identified or referred to in the direct examination. Your motion is denied."

The Company's counsel made no further effort to elicit such information. He did not call as witnesses on the Company's case any one of the three Union organizers whose names he secured nor Sutton, nor employee Lollis at whose home the

meeting was held and who was present at the meeting. On cross-examination of the Board's witness Lollis, the Company's counsel asked no questions concerning the details of the meeting other than to establish that Lollis was present.

While it is apparent to us that the question asked by the Company's counsel was within the proper scope of cross-examination, the ruling of the Trial Examiner did not constitute prejudicial error under the circumstances shown. The Trial Examiner made it clear that his ruling was based on the ground of restricting cross-examination to matters testified on direct examination. There is nothing in the record to indicate that the ruling would have been the same if the Company's counsel had sought to elicit such information on the Company's case by calling as witnesses one or more of the Union's organizers, employee Sutton, and employee Lollis. The Company, therefore, was not denied the opportunity to offer witnesses who might contradict Sutton's testimony that he secured the Union's authorization cards at the meeting. The record does not support the Company's contention that the ruling of the Trial Examiner excluded relevant and material evidence.

■ The second ruling likewise arose on cross-examination of Sutton. On direct examination, Sutton testified that on April 21, 1960, at the Company's plant, he obtained the signatures of 8 or 9 employees on the Union's authorization cards. On cross-examination, the Company's counsel sought to elicit the names of such employees. The Board's counsel objected to such disclosure. The Trial Examiner sustained the objection. The Company's counsel's stated purpose in seeking the names of the employees who had signed the cards was two-fold: First, to show that the treatment given by the Company to persons active in the Union as compared to the treatment given employees not active in the Union, was not discriminatory; and, second, to corroborate the Company's contention that Sutton was discharged on that day because he was, and had been, an unsatisfactory employee inattentive to his duties, and on that day was not attending to his duties but was spending his time in endeavoring to secure employee signatures on the Union's authorization cards. The record discloses that the Trial Examiner sustained the objection of the Board's counsel because it did not then appear to the Trial Examiner that the question was relevant to the issue of the circumstances surrounding Sutton's discharge, as established on his direct examination, but indicated that he would re-consider the materiality of such question should it re-appear in the presentation of the Company's case. The Company's counsel stated:

"Well, Mr. Examiner, in that case I will just have to recall this witness in my case and I ask him these questions."

The witness was not called on the Company's case and the Company's counsel made no further effort to elicit identities of employees who had signed the Union's authorization cards. Under such circumstances, it cannot be said that the ruling of the Trial Examiner constituted prejudicial error.

We have considered other claimed errors of the Trial Examiner in the admission of evidence and find them without substance.

Under points two and three, the Company contends that the Board's findings that the Company violated Section 8(a) (1) and (3) of the Act by discharging employee James Sutton and that the Company violated Section 8(a) (1) of the Act, are not supported by substantial evidence on the record considered as a whole.

We have carefully examined the entire record on this case. We find, as in most cases of this type, the evidence to be in sharp conflict on material matters in numerous instances. The Company's main contention appears to be that such conflicts should be resolved in favor of the Company's contentions in that the testimony of its witnesses was entitled to more credence than opposing testimony.

■ Under Section 8(e) of the Act, the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole, shall be conclusive. As stated by this court, in National Labor Relations Board v. Stanislaus Implement and Hardware Company, Ltd., 9 Cir., 226 F.2d 377 (1955), at page 381:

"This court does not sit to parrot the Board's conclusions; but neither does it sit to judge the credibility of witnesses; Precision Fabricators v. N. L. R. B., 2 Cir., 1953, 204 F.2d 567; N. L. R. B. v. San Diego Gas & Electric Co., 9 Cir., 1953, 205 F.2d 471, 475, or dispute the Board's choice between two fairly conflicting views, although this court might justifiably make a different choice were the matter before it de novo. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Howell Chevrolet Co., 9 Cir., 1953, 204 F.2d 79, 85.

"The testimony upon which the Board and trial examiner placed reliance was not inherently improbable nor the evidence introduced by Respondent so overwhelming as to render that testimony untrustworthy; the evidence in the record as a whole lends itself to two fairly conflicting inferences. The court therefore, recognizing the function of the Board as the trier of fact, will not disturb its findings."

■ We see no purpose to be served by summarizing the conflicting evidence offered by the Company. The statement of facts appearing earlier in this opinion, together with the reasonable inferences to be drawn therefrom, fully supports the Board's findings that the Company violated Section 8(a) (3) and (1) of the Act by discharging employee James Sutton because of his Union activities, and that the Company violated Section 8(a) (1) of the Act by interrogating and polling its employees, and by attempting to interfere with their choice of a collective bargaining representative.

■ Under point four, the Company complains that the Board's order is too broad in scope because (a) it directs the Company to cease and desist from discouraging membership "in any other labor organization"; (b) that that portion of the Board's order with respect to directing, requesting or inducing employees to engage in any activity on behalf of, or against, any labor organization, is violative of the rights granted to employers under Section 8(c) of the Act; and (c) that the phrase "in any other like or related manner" is too broad.

In National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, Local 10, et al., 283 F.2d 558 (9th Cir., 1960), this court stated, at page 568:

"The Board cannot restrain practices which it has neither found to have been pursued nor to be related to proven unlawful conduct. Communications Workers of America, A. F. of L.-C. I. O. v. N. L. R. B., 1960, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896. See also Morrison-Knudsen Co. v. N. L. R. B., 9 Cir., 1960, 276 F.2d 63, 76. A broad order will be modified unless the evidence supports a proclivity for unlawful action or unless a finding relating to the likelihood of similar violations is made either by the Board or the Trial Examiner. See N. L. R. B. v. Local 476, United Ass'n. of Journeymen, etc., Plumbers, 1 Cir., 1960, 280 F.2d 441. * * *"

We believe that under the record in this case the order of the Board should be modified by striking therefrom the words "in any other labor organization" and by adding to that portion of the order directing, requesting or inducing any of its employees to engage in any activity on behalf of or against any labor organization, the clause "except as provided in Section 8(c) of the Act."

The petition for enforcement of the order as herein modified is granted.